890 F.2d 1329
 65 A.F.T.R.2d 90-448, 90-1 USTC P 50,026
 Earl A. BROWN, Jr. and Betty Galt Brown, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
Earl A. BROWN, Jr., Independent Executor of the Estate of
Earl A. Brown, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
Earl A. BROWN, Jr., Independent Executor of the Estate of
Ellen Augusta Brown, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
Susan Brown BARRY, Guardian of Brice Galt Barry, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
Susan Brown BARRY, Guardian of Andrew Earl Barry, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
Susan Brown BARRY, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 88-2763.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 13, 1989.
 
 N. Shelton Jones, Earl A. Brown, Jr., Houston, Tex., for plaintiffs-appellants.
 Janet A. Bradley, Gary R. Allen, Chief, Appellate Section, Tax Div., Dept. of Justice, William S. Rose, Jr., Washington, DC Robert S. Pomerance, Robert A. Bernstein, Asst. Attys. Gen., for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before WISDOM, KING and WILLIAMS, Circuit Judges.
 KING, Circuit Judge:
 
 
 1
 Appellants, Earl A. Brown Jr. and his wife Betty Galt Brown,[1] are seeking a refund of federal income taxes, interest, and penalties for the taxable years 1977 through 1982. They appeal from the district court's summary judgment in favor of the Government. We AFFIRM the judgment.
 
 I. BACKGROUND
 
 2
 In 1968, Ellen Augusta Brown died, leaving a will that provided, in pertinent part:
 
 
 3
 I give, devise and bequeath unto my husband, Earl A. Brown, as Trustee, all of the property, real, personal and mixed, wheresoever situated, which I may own at the time of my death, upon the following terms, conditions, and directions:
 
 
 4
 (1) This trust is created for the benefit of my son, Earl A. Brown, Jr., and his lineal descendants, and shall extend and be in force until the death of the Trustee. Upon the death of the Trustee, Earl A. Brown, all of the trust property then remaining shall go to my son, Earl A. Brown, Jr., if he is living, subject to the conditions and provisions hereinafter set forth.... Upon the death of Earl A. Brown [Sr.] this trust shall terminate....
 
 
 5
 * * *
 
 
 6
 In the event Earl A. Brown, Jr. survives his father, Earl A. Brown, and receives the trust property mentioned above, I give unto the said Susan Brown Barry all of the said trust property remaining in his hands at the time of his death. In this behalf I would direct my son, Earl A. Brown, Jr., during his lifetime, to use all the income from said property for his own personal use, in any manner he may see fit; and to sell and convey any part of the corpus of said estate and reinvest the proceeds thereof in such other assets and securities, except real estate, that he may regard as being for the best interest of the trust estate and its preservation. Also, I would direct the said Earl A. Brown, Jr. to sell and dispose of a portion of the corpus of my estate and personally use the proceeds thereof only if such sale is required to satisfy his personal needs and necessities; but it is my hope and request that he keep intact as much as possible of the said trust property which comes into his hands, both real and personal, to pass on to and become vested in our beloved granddaughter, Susan Brown Barry, upon his death.
 
 
 7
 Earl A. Brown Sr. died in 1969. In addition to setting out several specific bequests, his will provided:
 
 
 8
 All of the rest, residue and remainder of my estate, real, personal and mixed, I give, devise and bequeath unto my son, Earl A. Brown, Jr., to be his property. I do this, however, in the knowledge and belief that he will use such portions of the said assets, whenever, in his opinion, it may be necessary or desirable to meet the needs of my beloved granddaughter, Susan Brown Barry, and her lineal descendants. Upon the death of the said Earl A. Brown, Jr. it is my wish that any of said property remaining in his hands shall go to Susan Brown Barry, if she be living, and if she be not living, then to her lineal descendant or descendants, share and share alike.
 
 
 9
 Appellant Earl A. Brown Jr. ("Brown") was named independent executor of his parents' estates (the "Estates"). By July 1971, the formal steps of independent administration were complete: The wills had been admitted to probate; the probate court had approved the inventory and appraisement lists of the Estates' assets, finding in each case that no debts or claims were outstanding; federal estate taxes and Texas inheritance taxes had been paid. To date, however, Brown has not closed either estate.
 
 
 10
 In 1981, the Internal Revenue Service ("IRS") audited the tax returns filed by Brown on behalf of the Estates and determined that administration had been unduly prolonged and that the Estates had terminated for federal income tax purposes as of December 31, 1976.[2] Consequently, taxable income previously reported by the Estates was assessed against Brown as beneficiary under the wills.
 
 
 11
 In February 1982, the IRS sent appellants Earl and Betty Brown ("Taxpayers") a notice of deficiency for the years 1977 and 1978.[3] Shortly after receiving this notice, Brown requested, and received, authorization from a Texas probate court to continue the administration of his parents' Estates. Taxpayers paid the assessed deficiencies and filed administrative claims for refunds with the IRS. The IRS denied their claims. Taxpayers then filed a complaint in federal district court seeking--ultimately--a refund of $698,946.50 plus costs.[4] Taxpayers claimed that the IRS improperly deemed the Estates terminated and thus incorrectly attributed the Estates' income to Brown.
 
 
 12
 Both sides moved for summary judgment. On July 15, 1985, the district court denied the motions. Both sides then filed motions for reconsideration, supported by numerous briefs. After a hearing on all pending motions, the district court determined that reconsideration was appropriate.
 
 
 13
 On December 10, 1987, the district court granted partial summary judgment for the United States. The court held that the IRS had properly considered the Estates terminated for federal income tax purposes. Taxpayers' motion for partial summary judgment was denied. After the parties settled the remaining non-estate issues, and stipulated as to tax adjustments resulting from such settlement, the court entered a final judgment. Taxpayers timely appealed.
 
 
 14
 We have distilled Taxpayers' numerous arguments on appeal to a few central issues. Taxpayers assert that the district court erred by: (1) failing to follow the binding precedent of a prior Fifth Circuit opinion and thus to defer to the Texas probate court's order that the Estates could remain open at the discretion of Brown; (2) upholding the IRS's determination that the Estates had been unduly prolonged; (3) upholding the IRS's assessment of the Estates' income tax against Brown, since the court made no clear determination as to what interest he received under the wills of his parents; and (4) not granting Taxpayers' motion for summary judgment on the grounds of equitable and "actual" estoppel.
 
 II. DISCUSSION
 
 15
 We review a district court's grant of summary judgment by evaluating the record under the same guidelines as were used by the district court. Summary judgment is proper if it appears from pleadings, depositions, admissions, and affidavits, considered in a light most favorable to the nonmovant, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Galindo v. Precision American Corp., 754 F.2d 1212, 1216 (5th Cir.1985). Only disputes over facts that might affect the outcome of the case preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 16
 We first note the burden of persuasion borne by the parties in this case. An IRS deficiency notice is clothed with a "presumption of correctness." United States v. Janis, 428 U.S. 433, 441, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976). In a refund suit, the taxpayer bears the burden of proving both the error in the assessment and the amount of refund to which he is entitled. Id.; Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 148-49 (5th Cir.), cert. denied, 464 U.S. 935, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983).
 
 
 17
 The underlying facts that we find controlling in this case are undisputed. "When everything that can be adduced at trial is before the judge ... and the parties, while urging conflicting ultimate facts or conclusions, have no evidentiary disputes, a trial serves no useful purpose." Fontenot v. Upjohn Co., 780 F.2d 1190, 1197 (5th Cir.1986). Our appellate role in this case, therefore, is to review de novo the legal conclusions of the district court.[5] After a careful review of the record and the relevant authorities, we concur with the district court's determination that the United States is entitled to judgment as a matter of law.
 
 
 18
 A. 26 U.S.C. Sec. 641(a)(3) and Treasury Regulation Sec. 1.641(b)-3(a)
 
 
 19
 Subchapter J of the Internal Revenue Code of 1954 (the "Code") sets forth the statutory framework for the federal taxation of estates and trusts. Under Subchapter J, the income earned by an estate or trust is taxed only once, either against the estate or trust, as a separate tax entity, or against the beneficiaries, as to the income that is distributed or is deemed distributed. Section 641 provides that the taxable income of a decedent's estate shall be computed in the same manner as the taxable income of an individual, except as otherwise prescribed in Part I of Subchapter J. 26 U.S.C. Sec. 641(b).
 
 
 20
 We are concerned in this case with the application of section 641(a)(3), which imposes a federal tax on
 
 
 21
 the taxable income of estates or of any kind of property held in trust, including--
 
 
 22
 (3) income received by estates of deceased persons during the period of administration or settlement of the estate.
 
 
 23
 26 U.S.C. Sec. 641(a)(3). The pivotal issue for Taxpayers is the meaning of the term "period of administration." Congress has never provided a statutory definition for this term; therefore, the IRS has long interpreted the broad language of section 641(a)(3) in its regulations. The Treasury Regulations promulgated under the 1939 Internal Revenue Code, interpreting the same statutory language,[6] provided that the period of administration is the time actually required by the executor or administrator to perform the ordinary duties pertaining to administration, "whether longer or shorter than the period specified in the local statute for the settlement of estates." Treas. Reg. Sec. 19.162-1 (1940).[7]
 
 
 24
 In 1956, the IRS promulgated new regulations under the 1954 Code. The IRS reissued the above-quoted regulation--renumbered to correspond to the 1954 Code--incorporating the substance of the former version, but clarifying the meaning of "period of administration."[8] Two pertinent sentences were added:
 
 
 25
 However, the period of administration of an estate cannot be unduly prolonged. If the administration of an estate is unreasonably prolonged, the estate is considered terminated for Federal income tax purposes after the expiration of a reasonable period for the performance by the executor of all the duties of administration.
 
 
 26
 Treas. Reg. Sec. 1.641(b)-3(a) (1956).
 
 
 27
 Under the plain language of the amended regulation, the Commissioner has authority to determine whether an estate's administration has been "unduly prolonged" and to deem the estate closed for federal income tax purposes once a reasonable time has elapsed for the administrator to have performed all the ordinary duties of administration. Taxpayers disagree with this interpretation of section 641(a)(3), citing as support our prior decision in Frederich v. Commissioner, 145 F.2d 796 (5th Cir.1944), a case decided under the 1939 Internal Revenue Code and the former version of Treasury Regulation Sec. 1.641(b)-3(a). They contend that we must interpret the statutory term "period of administration," purportedly as did the Frederich court under the facts of that case, to mean the period that an administrator actually consumes before closing the estate, regardless of a determination by the Commissioner that a reasonable time has passed for the estate's termination. Taxpayers also argue that, in any event, a 1982 Texas probate court order, authorizing Brown to continue administration of the Estates at his discretion, was conclusive on the issue of whether the period of administration had terminated under section 641(a)(3), again citing Frederich as authority.
 
 
 28
 We construe Taxpayers' arguments as a challenge to the validity of Treasury Regulation Sec. 1.641(b)-3(a) and an invocation of the "law of the circuit" rule, under which one Fifth Circuit panel may not overrule the decision, right or wrong, of a prior panel. The Government, in turn, contends that the regulation is a valid and reasonable interpretation of section 641(a)(3), and that Frederich is no longer good law in this or any other circuit. The Government also asserts that under the teaching of Commissioner v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), a lower state court ruling cannot be controlling in a federal tax dispute; therefore, the IRS and the district court acted properly in conducting an independent review of whether the Estates had terminated for federal income tax purposes.
 
 1. Treasury Regulation Sec. 1.641(b)-3(a)
 
 29
 The IRS promulgated Treasury Regulation Sec. 1.641(b)-3(a) under the general authority granted by Congress to the Treasury Department to "prescribe all needful rules and regulations" for the interpretation and enforcement of the Code. 26 U.S.C. Sec. 7805(a). The congressional delegation of authority found in section 7805 helps avoid "the wasteful litigation and continuing uncertainty that would inevitably accompany any purely case-by-case approach" to application of the Code, United States v. Correll, 389 U.S. 299, 302, 88 S.Ct. 445, 447, 19 L.Ed.2d 537 (1967), and helps ensure that rules and regulations "will be written by 'masters of the subject,' who will be responsible for putting the rules into effect," National Muffler Dealers Ass'n v. United States, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979).
 
 
 30
 As pointed out by Taxpayers, such an "interpretive regulation" is entitled to somewhat less judicial deference than a "legislative regulation," issued under a specific grant of authority in the Code to define a particular statutory term or to prescribe a method of executing a statutory provision. Rowan Cos. v. United States, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981). Nonetheless, an interpretive regulation is "entitled to substantial weight." Lykes v. United States, 343 U.S. 118, 127, 72 S.Ct. 585, 590, 96 L.Ed. 791 (1952). "[I]t is fundamental, of course, that as 'contemporaneous constructions by those charged with administration of' the Code, the Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes,' and 'should not be overruled except for weighty reasons.' " Bingler v. Johnson, 394 U.S. 741, 749-50, 89 S.Ct. 1439, 1444-45, 22 L.Ed.2d 695 (1969). Upholding the validity of an IRS interpretive rule in Correll, the Supreme Court stated:
 
 
 31
 [W]e do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. Sec. 7805(a). In this area of limitless factual variations, "it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments." The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner. Because the rule challenged here has not been shown deficient on that score, the Court of Appeals should have sustained its validity.
 
 
 32
 389 U.S. at 306-07, 88 S.Ct. at 449-50 (citation omitted).
 
 
 33
 The regulation at issue in this case represents an effort by the Commissioner to supply a needed definition, omitted by Congress, for the general term "period of administration." In National Muffler Dealers Ass'n, the Supreme Court provided a framework for reviewing the validity of an interpretive regulation such as Sec. 1.641(b)-3(a). In determining whether the regulation carries out the congressional mandate in a proper manner, several factors are important: whether the regulation comports with the language and history of the statute to which it applies, whether it is a "substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent," how long the regulation has been in effect and the reliance placed on it, the consistency of the Commissioner's interpretation and application of the regulation, and "the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute." National Muffler Dealers Ass'n, 440 U.S. at 477, 99 S.Ct. at 1307.
 
 
 34
 We must determine whether Treasury Regulation Sec. 1.641(b)-3(a), as expanded in 1956, validly vests the Commissioner with authority to deem an estate's administration terminated for purposes of taxing the estate's income to the beneficiaries, even in cases, such as this one, where administration might legally be continued under state law. The broad language of section 641(a)(3) is open to different interpretations, and the legislative history prior to the 1954 Code is unenlightening. However, in the absence of statutory language to the contrary, the Supreme Court has advised that a provision of the Internal Revenue Code should be read "so as to give a uniform application to a nationwide scheme of taxation." Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932).[9] Although state probate laws would, of course, be pertinent in the Commissioner's determination of what the ordinary duties of administration entailed in a particular case, the existence of an estate as a taxable entity is a question of federal, not state, law. Under the Harmel presumption, section 641(a)(3) of the Code can be fairly read to require a uniform federal standard by which the Commissioner may deem an estate closed if the reasonable period of time required to perform the ordinary administrative duties has passed, and the administrator is unduly prolonging the estate's termination.
 
 
 35
 In the committee reports accompanying the enactment of the 1954 Code, both the House and Senate Reports describe the period of administration as
 
 
 36
 the period actually required by the administrator or executor to perform the ordinary duties of administration, such as the collection of assets and the payment of debts, legacies, and bequests, whether this period is longer or shorter than the period specified under local law for the settlement of estates.
 
 
 37
 H.R.Rep. No. 1337, 83d Cong., 2d Sess., reprinted in 1954 U.S.Code Cong. & Ad.News 4017, 4331; S.Rep. No. 1622, 83d Cong., 2d Sess., reprinted in 1954 U.S.Code Cong. & Ad. News 4621, 4980-81. This language adopts the substance of the Treasury Regulation promulgated under the Internal Revenue Code of 1939 interpreting "period of administration," and thus indicates congressional endorsement of the then-existing regulation. Taxpayers do not dispute the validity of the predecessor to Treasury Regulation Sec. 1.641(b)-3(a).
 
 
 38
 As described above, the IRS added a caveat to the regulation in 1956 that emphasizes the Commissioner's authority to ascertain whether an estate's administration has been unreasonably prolonged for federal income tax purposes. Taxpayers contend that this revision "is not binding on the taxpayer or this Court." However, we find that this change does not contradict the prior regulation, apparently approved by Congress, but merely makes explicit what was formerly implicit. If Congress intended that an estate's period of administration for purposes of section 641(a)(3) of the Code should not turn on "local law for the settlement of estates," it appears to us obvious that the period must turn on a federal factual standard, as ascertained by the federal agency charged with enforcement of the Code.
 
 
 39
 This interpretation of section 641(a)(3) and its accompanying regulation, that the Commissioner is clothed with the authority to deem an estate terminated for income tax purposes if it has been unduly prolonged, has been consistently espoused by the Commissioner--both before and after the amendment to the regulation in 1956--and consistently accepted by the courts. See, e.g., Miller v. Commissioner, 39 T.C. 940, 947 (1963), aff'd, 333 F.2d 400 (8th Cir.1964); Chick v. Commissioner, 166 F.2d 337 (1st Cir.), cert. denied, 334 U.S. 845, 68 S.Ct. 1514, 92 L.Ed. 1769 (1948); Estate of Farrier, 15 T.C. 277, 281-82 (1950). Moreover, the IRS promulgated Treasury Regulation Sec. 1.641(b)-3(a) less than two years after Congress's enactment of the 1954 Code; therefore, the regulation "represents a substantially contemporaneous construction of Subchapter J's conduit principles by those with the expertise to appreciate and define the intent and purposes" of the statute. United States Trust Co. v. IRS, 803 F.2d 1363, 1370 (5th Cir.1986). The amended regulation has now been in effect for over 30 years, yet Congress has left section 641(a)(3) unchanged despite several amendments to the 1954 Code and the enactment of the Internal Revenue Code of 1986. This acquiescence strongly suggests congressional approval of the longstanding interpretation of section 641(a)(3) by the Commissioner. See Lykes, 343 U.S. at 127, 72 S.Ct. at 590.
 
 
 40
 Taxpayers' position is that "period of administration" should be read to mean the actual period an administrator keeps the estate open, irrespective of whether all ordinary duties actually required for the estate's existence have been completed except for the transfer of the estate's corpus to the legal beneficiaries. We do not believe that Congress intended a rule such as Taxpayers propose that would result both in nonuniform benefits to taxpayers and potential detriment to the Treasury.[10] The increasing popularity of independent estate administrations, for example, in which an administrator operates free of court intervention and under which an estate might legally remain open indefinitely, creates the potential for prolonging an estate to achieve income-splitting and tax avoidance goals, a strategy not available to those estates administered under court supervision. The risk to the Government of lost revenues is most pronounced in cases where the estate fiduciary is also the sole or principal beneficiary of the estate's assets, a not uncommon situation.
 
 
 41
 Even if we believed Taxpayers' position to be a logical and reasonable interpretation of section 641(a)(3), a conclusion we cannot endorse, Taxpayers could not prevail on that point alone. The issue is whether the Commissioner's interpretation of the statute is a reasonable one, not whether it is the only, or even the best, one. "The choice among reasonable interpretations is for the Commissioner, not the courts." National Muffler Dealers Ass'n, 440 U.S. at 488, 99 S.Ct. at 1312. We conclude, as has every other court faced with this issue, that Treasury Regulation Sec. 1.641(b)-3(a) is a reasonable and valid interpretation of section 641(a)(3).
 
 2. Frederich v. Commissioner
 
 42
 Taxpayers contend that our 1944 opinion in Frederich v. Commissioner, 145 F.2d 796 (5th Cir.1944), is binding precedent for their propositions that (1) the period of administration envisioned by section 641(a)(3) of the Code is that period "actually consumed" by an administrator, not the period "actually required" to perform the ordinary duties of administration, and (2) a lower state court's finding relating to an estate's period of administration is controlling in a subsequent federal tax controversy involving section 641(a)(3). In this section, we review Frederich to find support for Taxpayers' first proposition. In light of later Fifth Circuit decisions that have limited the case to its special facts, however, we conclude that Frederich does not stand for the proposition Taxpayers suggest. As for Taxpayers' argument regarding the conclusive nature of the probate court's order, we conclude in the next section of this opinion that the United States Supreme Court, in Commissioner v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), has implicitly overruled Frederich on this point. Thus, we agree with the Government's position that the legal propositions stated in Frederich no longer represent the law of this circuit.
 
 
 43
 The decedent in Frederich had been one of two partners carrying on the business of "Frederich's Market." After Frederich's death in 1934, the surviving partner continued the business with Frederich's estate constituting the other partner. Frederich's heirs wished the partnership to continue until such time as the business could be liquidated through an advantageous sale.
 
 
 44
 In Florida at that time, the County Judge's Court supervised the administration of estates. In 1938, a County Judge's Court appointed the surviving partner administrator of Frederich's estate and ordered the partnership to continue, pursuant to a Florida statute requiring County Judge supervision of a personal representative's continuation of a decedent's trade or business for a reasonable time. In 1942, the County Judge approved all previous acts of estate administration and again ordered continuation of the estate's interest in the business of the partnership.
 
 
 45
 In 1943, the IRS Commissioner asserted, and a Tax Court held, that the profits of the estate for tax years after 1937 would be deemed the taxable income of the heirs. The court found that all assets of the decedent had been collected and his debts paid prior to 1937, and that nothing substantial thereafter remained to be done except to make a distribution of the assets of the estate. A divided Fifth Circuit court reversed the judgment of the Tax Court.
 
 
 46
 Frederich was decided under the predecessor to Treasury Regulation Sec. 1.641(b)-3(a).[11] As explained above, the former version was substantially similar to the current regulation; both versions define period of administration as the period "actually required" to perform the ordinary duties of administration. The court upheld the validity of the regulation and this language, but interpreted the regulation narrowly due to the facts of that case--most significantly, the fact that Frederich's estate was being administered subject to the direct supervisory jurisdiction of a Florida court.
 
 
 47
 The Frederich majority held that the Commissioner had no power to determine the reasonable period within which the administrator should conclude his administration where "under the Law of Florida the County Judge, having not only such power but also the duty to determine that question, should fix a different period." Frederich, 145 F.2d at 798. The court stressed the fact that the regulation as then worded contained no express language regarding either the "reasonable period" for settling estates or the Commissioner's role in determining that period, id., an omission of emphasis that the IRS has since rectified. The court did not address the issue of who would be empowered to determine the period of administration in independent administrations, where continuing court supervision is unnecessary, and whether a reasonableness standard would be appropriate in such situations. Rather, Frederich was premised on the majority's conclusion that a court order to prolong an administration, issued by a local court with statutory jurisdiction to supervise the administration of a decedent's business and authorize its continuation, conclusively established the period "actually required" to administer the estate.
 
 
 48
 It is true that Frederich contains dicta, unfortunately broad, lending support to an argument that under section 641(a)(3) of the Code, the Commissioner has no authority under any circumstances to determine a reasonable period of administration that differs from the period an administrator actually consumes.[12] However, no court has ever cited Frederich for such a proposition. Moreover, our reading of a narrower holding is supported by Fifth Circuit cases decided after Frederich.
 
 
 49
 In Stewart v. Commissioner, 16 T.C. 1 (1951), aff'd, 196 F.2d 397 (5th Cir.1952), the decedent was a member of a partnership which was governed by an agreement providing that the partnership--and decedent's interest therein--should continue for five years following his death. Stewart died in 1938. His widow continued to administer the estate, of which she was independent executrix, until 1947. The IRS deemed the estate terminated prior to 1942, and taxed its income for the years 1942 through 1945 to the widow as sole beneficiary under her husband's will. The Tax Court found in favor of the Commissioner, concluding that petitioner had completed all the ordinary duties of independent administration prior to December 31, 1941. Id. at 15. The Tax Court distinguished Frederich, for as opposed to the executor in that case, the Stewart petitioner was an independent executrix, acting without interference by the probate court.[13] Id. at 10.
 
 
 50
 The Fifth Circuit affirmed. In an opinion written by Judge Holmes, the dissenter in Frederich, the court stated:
 
 
 51
 Congress could, and in the interest of a uniform system of federal taxation did, clothe the Commissioner and the Tax Court with the power to determine (in the absence of conflicting valid affirmative action by the state court having jurisdiction in the premises) that an estate has ceased to be in the process of administration or settlement, and has ceased to exist for income tax purposes, when the administrator or executor has performed all the ordinary duties incumbent upon him in his fiduciary capacity.
 
 
 52
 Stewart, 196 F.2d at 398 (citing Chick, 166 F.2d at 337). See also Estate of Farrier, 15 T.C. at 281-82 (distinguishing Frederich on same grounds).
 
 
 53
 Likewise, our opinion in Brown v. Commissioner, 215 F.2d 697, 701 (5th Cir.1954), implicitly recognizes the power of the Commissioner to ascertain, under a reasonableness standard, whether the administration of a decedent's estate has terminated for federal income tax purposes. We held for the taxpayers in that case, however, because we concluded that it was not unreasonable to continue the administration during settlement efforts with a contestant to the decedent's will. Id. See also Wylie v. United States, 281 F.Supp. 180, 189-90 (N.D.Tex.1968) (citing with approval the language of the current Treasury Regulation).
 
 
 54
 Thus, after Stewart and Brown, Frederich was limited to a case in which a probate court has entered an order authorizing the continuation of an estate's administration, pursuant to the court's supervisory jurisdiction. In the instant case Brown sought and obtained an order from a Texas probate court authorizing him to continue the administration of his parents' Estates; however, as independent administrator, he did not require such an order to legally continue his administration. We must next examine, therefore, the effect of the order of the probate court on this tax controversy, and whether we are bound by Frederich to consider the order determinative of whether the Estates are still in the process of administration.
 
 
 55
 3. Effect of the Probate Court Order of April 29, 1982
 
 
 56
 In March 1982, shortly after the IRS sent deficiency notices to Taxpayers notifying them of the termination of the Estates for income tax purposes, Brown filed petitions in the probate court of Dallas County, Texas, requesting the court to find that the Estates required ongoing management and administration. The United States was not a party to this action. In a nonadversary proceeding in April 1982, the probate court entered an order authorizing Brown to continue to manage the assets of the Estates as independent executor until such time as he determined "in his sole discretion" that it would be in the best interest of the beneficiaries to terminate the Estates.[14] Taxpayers argued below, and maintain on appeal, that this probate court decree was binding on both the IRS and the district court and that Frederich is dispositive on the issue. We reject Taxpayers' argument.
 
 
 57
 Because the United States was not made a party to the probate court proceeding, the ensuing order was not "binding" on the Commissioner in the sense of res judicata or collateral estoppel; see Commissioner v. Estate of Bosch, 387 U.S. 456, 462-63, 87 S.Ct. 1776, 1781-82, 18 L.Ed.2d 886 (1967); cf. Warren v. Secretary of Health and Human Services, 868 F.2d 1444, 1447 (5th Cir.1989). The issue, therefore, is what degree of deference the district court should have accorded this state judgment.
 
 
 58
 It is axiomatic that federal law controls the interpretation of federal statutes and regulations. In the field of federal taxation, however, federal and state law are tightly intertwined. The Internal Revenue Code does not operate in a vacuum; it attaches tax significance to legal rights and transactions that are created under state law.
 
 
 59
 When a taxpayer's federal tax liability clearly turns on the characterization under state law of a property interest, a state court's determination of that interest is obviously relevant in a subsequent federal tax controversy. Yet even in this situation, where greatest deference to state law is needed, the Supreme Court has adopted an Erie approach. In Bosch, decided 23 years after Frederich, the Court held that in such cases, federal authorities are to give "proper regard" to a lower state court's adjudication of the relevant issue, but need not accept such rulings as conclusive. 387 U.S. at 465, 87 S.Ct. at 1782. Unless the highest court in the state has spoken to the issue, a federal court is to make its own inquiry into state law. Id. When a federal tax law establishes a uniform criterion for taxing certain transactions or situations--irrespective of how state law might label those transactions or situations--the decision of a state probate court as to an underlying issue a fortiori should not be controlling. Thus, regardless of whether section 641(a)(3) creates a uniform federal criterion--as we have concluded in this opinion--or defers to a state's local characterization of the statute's terms, the Supreme Court holds that a federal court must make its own inquiry into relevant issues previously decided by a lower state court.
 
 
 60
 On the other hand, because state law pervades every tax issue, it would not be accurate to say that a federal court is free to simply ignore a state court's adjudication of relevant underlying facts. The relevance of a state court's judgment to the resolution of a federal tax question will vary, depending on the particular tax statute involved as well as the nature of the state proceeding that produced the judgment. An examination of the state court's judgment will usually be a relevant factor for the federal court's determination of whether "ordinary duties" required under state probate law are "actually required." However, the issue of whether administration has been unduly prolonged for purposes of section 641(a)(3) of the Code is ultimately one of federal, not state, law. Maresca Trust v. Commissioner, 46 T.C.M. (CCH) 1147, 1149 (1983); Armstrong v. Commissioner, 2 T.C. 731, 734 (1943); see Carson v. United States, 161 Ct.Cl. 548, 317 F.2d 370, 380-81 (1963) (Reed, J., dissenting). We next consider the nature of the local proceeding and the resulting decree to evaluate the judgment's relevance to this tax refund case and to determine whether the district court should have accorded it greater weight as an evidentiary factor.
 
 
 61
 We note first the nonadversary quality of the Texas probate court proceeding instituted by Brown. The United States was not a party. Moreover, Brown and the putative remaindermen agreed that Brown's administration of the Estates should continue, and it was apparently to their economic benefit to do so. Under these circumstances, the court was not presented with all the relevant facts and differing views that would have afforded the basis for a full analysis of the estate administration issue. In addition, the natural tendency of a busy probate court is to accede to a proposed order without great deliberation when all known interested parties are in agreement and when state interests are not adversely affected.
 
 
 62
 It is evident that Texas state interests were not affected--or even implicated--as a result of the probate court proceeding in question. Not only was there no genuine controversy involved, the probate court's order was unnecessary under the Texas Probate Code provisions relating to independent administrations. An independent executor such as Brown has authority to determine when to terminate the administration of an estate free of any court intervention. See Tex.Probate Code Ann. Secs. 145(h), 149B, 151, 152 (Vernon 1980); Dallas Services for Visually Impaired Children, Inc. v. Broadmoor II, 635 S.W.2d 572, 578 (Tex.App.--Dallas 1982, writ ref'd n.r.e.). Absent objection from a person interested in the estate, there is no statutory requirement regarding the period within which independent administration must be closed. The Dallas County Probate Court merely placed official approval on actions that Brown could have legally pursued without the court's direction. Thus, the judgment had no practical consequences apart from this federal tax controversy, and was consequently entitled to little weight in the district court.[15] See Edelman v. United States, 165 Ct.Cl. 91, 329 F.2d 950, 954 (1964).
 
 
 63
 In sum, Frederich does not accurately reflect the current, and valid, interpretation of section 641(a)(3) of the Internal Revenue Code embodied in Treasury Regulation Sec. 1.641(b)-3(a), and provides Taxpayers no basis for overturning the district court's judgment. The Commissioner acted well within his discretion in making an independent determination of whether the Estates had been unduly prolonged.
 
 
 64
 B. Termination of the Estates for Federal Income Tax Purposes
 
 
 65
 Taxpayers argue in the alternative that, assuming Treasury Regulation Sec. 1.641(b)-3(a) is a valid interpretation of section 641, and one to which this court must defer, the IRS nevertheless acted contrary to the regulation because the Estates were not unduly prolonged. In this case, the IRS determined after its 1981 audit of the Estates that administration had continued for over 12 years and, based on the duties performed and yet to be performed, a reasonable time had passed for terminating the Estates. The district court reviewed that determination and agreed. The court found that by the end of 1976:
 
 
 66
 [a]ll papers necessary to probate the wills such as the inventories and appraisals were filed and approved. The inheritance taxes and the federal estate tax returns were filed. All the debts and expenses of the estates were paid. All assets were located and collected. There were no outstanding claims, will contests, or property title disputes. No litigation was pending regarding claims to the assets or claims by the estates. No federal income tax disputes or litigation were pending....[16]
 
 
 67
 Taxpayers do not dispute that these duties were completed well before December 31, 1976. However, they argue that the IRS should not have deemed the Estates terminated because Brown's continued administration was necessary to (1) pay income taxes assessed by the IRS for years subsequent to 1976, and (2) disburse legacies to beneficiaries.[17]
 
 
 68
 Taxpayers first contend that the federal tax assessments after 1976 created debts against the Estates; consequently, ongoing administration was needed to pay these debts. This argument is frivolous. The IRS continued to collect income taxes from the Estates because, prior to the 1981 audit, Brown had not terminated the Estates and accepted responsibility for the income. Under Taxpayers' circular rationale, an estate could continue indefinitely because administration would be needed to file yearly income tax returns. When the IRS determined in this case that administration had ceased, the Estates had paid all income taxes owed through December 31, 1976. As explained below, when Taxpayers contested termination of the Estates, the Commissioner was entitled to assess continuing alternative tax liability against both the Estates and Brown pending resolution of Taxpayers' refund action. The Estates contained ample funds to pay taxes for the subsequent years and, after this litigation is resolved, the IRS will credit the Estates for income taxes paid for tax years after 1976. It would largely defeat the purpose of Treasury Regulation Sec. 1.641(b)-3(a) if a refund claimant could litigate the issue of whether an estate had been properly deemed terminated by the Commissioner, and then use that litigation as the basis for arguing that the estate must remain open.
 
 
 69
 Taxpayers also contend that continued administration is needed to distribute legacies to Lucille Cathey and to Susan Brown Barry and her children. We do not find this argument convincing.
 
 
 70
 Earl Brown Sr.'s will provided a lifetime income to his secretary, Lucille Cathey, from a $30,000 investment, which was deposited among three savings and loan institutions. The will directed that the savings and loan institutions were to pay the income directly to Ms. Cathey and to return the funds to the estate after her death.[18] We agree with the district court that it is generally unreasonable to continue an estate until the death of a beneficiary. This is particularly true when a bequest is small in relation to the size of the total estate. "The administration of an estate is concerned primarily with the collection of assets and payment of claims, and not with the more or less permanent custody of property for the protection of a legatee." Williams, 16 T.C. at 904; see also LeFiell v. Commissioner, 19 T.C. 1162, 1177-78 (1953).
 
 
 71
 This reasoning applies with equal force to the purported legacies to Susan Brown Barry--Brown's only child--and her children. Moreover, we agree with the district court that such payments during Brown's lifetime were not specifically mandated by the wills.[19]
 
 
 72
 Our circuit has held that the question of whether the administration of an estate has been unduly prolonged is one of fact. See Stewart, 196 F.2d at 398. However, "the facts in a given case may be so clear that reasonable men could not differ on the question of whether the administration was or was not unduly prolonged, in which case, the question is one of law." Wylie, 281 F.Supp. at 190. We agree with the district court in this case that, as a matter of law, the continuing payments of federal income taxes and of the legacies described above were insufficient reasons to prolong the administration of the Estates for federal tax purposes.
 
 C. Assessment of Deficiency Against Brown
 
 73
 If an estate is considered terminated under section 641(a)(3), the gross income, deductions, and credits of the estate are considered the gross income, deductions, and credits of the beneficiaries succeeding to the property of the estate. Treas. Reg. Sec. 1.641(b)-3(d). The Commissioner determined in this case that, beginning January 1, 1977, income from the Estates' assets belonged to Brown and was taxable as his personal income.
 
 
 74
 In their motion for summary judgment, Taxpayers argue that upon termination of the Estates, the assets are to pass into trusts; therefore, even if the IRS properly deemed the Estates closed for tax purposes, the trusts, not Brown, should pay federal taxes on the income.
 
 
 75
 In return, the Government contends that a plain reading of the wills in their entirety indicates that Brown is sole beneficiary. However, the Government does not rest its case on this contention; it claims that it need only show that Brown was the life income beneficiary to establish that federal income taxes were properly assessed against him.
 
 
 76
 In its order of July 15, 1985, the district court declined to define the total interests held by Brown under the wills of his parents. However, the court did find that the wills clearly gave him a life interest in the Estates' income. The December 10, 1987, order, granting partial summary judgment for the United States, specifically adopted this finding, again, without going further.
 
 
 77
 Taxpayers complain on appeal that the property interests of Brown are thus left unsettled. They contend that the district court erred in upholding the Commissioner's assessment of the Estates' income taxes against Brown, because it did not ascertain the nature of Brown's interest as a beneficiary. They further contend that a determination of whether Brown owns a life estate interest in the oil and gas properties of the Estates is crucial. If he is merely a life beneficiary, Taxpayers argue, revenues from these properties must be divided between him and the remaindermen under the Texas "open mine" doctrine.
 
 
 78
 Taxpayers misconstrue the burden of proof in a refund action. It was not incumbent on the IRS to establish with certainty the property interests created under the wills in this case. The district court found that under their most liberal interpretation--from the Taxpayers' standpoint--the wills granted Brown a lifetime interest in income from the Estates. This finding is not clearly erroneous. We agree with the district court, and need look no further to determine that the IRS was justified in assessing income taxes against Brown as beneficiary.[20]
 
 
 79
 Nevertheless, Taxpayers argue on appeal that the district court erred in not resolving the extent of Brown's property interests under the wills. They urge that, if Brown is found to own a life estate in the oil and gas properties contained in the Estates, the Texas open mine doctrine[21] provides another basis for their entitlement to a tax refund. For the reasons explained below, we decline to entertain this argument on appeal.
 
 
 80
 Filing a proper administrative claim with the IRS is a prerequisite to a taxpayer's suit for a refund. 26 U.S.C. Sec. 7422(a); Treas. Reg. Sec. 301.6402-2(b)(1). Absent a waiver by the Government, a taxpayer is barred from raising in a refund suit grounds for recovery not clearly and specifically set forth in its claim for a refund. Mallette Bros., 695 F.2d at 155. Thus, Taxpayers' clear failure to raise the open mine doctrine in their refund claim would normally have ended this matter.
 
 
 81
 It appears, however, that the Government may have waived its right to insist upon compliance with the prerequisite IRS administrative procedures. In its November 26, 1984, "Defendant's Amended Memorandum of Law," the Government specifically addressed the open mine doctrine. Although it urged that Brown should be considered the sole beneficiary under his parents' wills, the Government admitted that if the court should adopt its alternative position of Brown as life tenant, the parties would be required "to compute the bonus and royalty payments from the subject assets for the years 1977 and 1978 and apply the Texas statutory breakdown between principal and income in respect to such payments."[22]
 
 
 82
 Assuming arguendo that the Government's actions amounted to a waiver of Treasury Regulation Sec. 301.6402-2(b)(1), however, such waiver would be irrelevant if Taxpayers did not request relief based on the open mine doctrine at the district court level. We will normally not review on appeal a claim that was not raised below.
 
 
 83
 Counsel for the Taxpayers on the appeal has not deigned to designate those portions of the record--other than the Government's own brief, described above--where the issue of proper allocation of oil and gas revenues was squarely raised and adequately discussed by the Taxpayers.[23] Nonetheless, we have located one brief reference in Taxpayers' twenty-page "Response of Plaintiffs to Motion of Defendant for Reconsideration of Motion ... for Partial Summary Judgment," filed August 22, 1985. Even here, however, Taxpayers do not argue that the IRS owes Brown a refund for income taxes erroneously charged to him--as life tenant of oil and gas properties--instead of to the remaindermen. Rather, Taxpayers mention the remaindermen's interest only to support their argument that the Estates must remain open to allow Brown, as independent executor, to invest the oil and gas proceeds--a function that Brown could obviously perform in his individual capacity as life tenant. Moreover, we cannot locate in the record any factual assertions as to the amount of refund the IRS owes Taxpayers due to its alleged error in allocating oil and gas income for wells that were not "open" when Brown's purported life tenancy began. This omission supports a conclusion that Taxpayers' argument was more an afterthought on appeal than a claim asserted below since, as explained above, Taxpayers had the burden in this refund suit of proving both an IRS error as well as the amount of refund to which they were consequently entitled. From one meager reference to the open mine doctrine in the avalanche of briefs and pleadings filed by Taxpayers in the district court, it is hardly surprising that the court failed to address the issue in either of its two orders ruling on the motions for summary judgment.
 
 
 84
 In their motion for reconsideration, filed after partial summary judgment was ordered for the Government, Taxpayers did not alert the district court to its failure to rule on what they now call a "critical factual determination." Moreover, prior to entry of final judgment, the parties engaged in detailed settlement negotiations regarding tax adjustments claimed by the Taxpayers, and filed a stipulation as to these matters with the court. At least one of the adjustments listed in the parties' stipulation directly relates to oil and gas lease bonus income. Surely that juncture represented an appropriate opportunity for Taxpayers to reach a settlement with the Government as to all issues regarding the allocation of oil and gas revenues among the Taxpayers. If settlement could not have been reached, Taxpayers could then have urged the district court to resolve the question of Brown's property interests before it entered a final judgment.
 
 
 85
 After failing to raise the open mine doctrine in their administrative claims for refunds, Taxpayers filed this lawsuit and had almost six years to develop the issue. They failed to do so beyond one short and misleading reference in a brief filed in 1985. It would be patently unfair to require the Government to litigate on remand a refund issue that apparently only came to light--and to only a tiny point of light at that--due to the diligence of the Government itself. We cannot in good conscience remand this case to the district court for further fact finding. This litigation, which has already consumed countless hours of judicial resources over its seven year life, at some point must end. That point has been reached. After a review of the lengthy record in this case, we cannot fairly characterize Taxpayers' conduct below as having "raised" the open mines issue in any manner sufficient to alert the district court to the necessity for ruling on it prior to entry of final judgment.
 
 D. Estoppel
 
 86
 Taxpayers present two separate estoppel arguments, neither of which merits lengthy discussion. First, Taxpayers contend that the Government is equitably estopped from terminating the Estates because of its 1974 audit of the Estates' income tax returns for the 1972 tax year, in which the IRS did not require any changes in the returns to reflect a deemed termination of the Estates. In 1981, the IRS again audited the tax returns filed by Brown on behalf of the Estates and determined at that time that administration had been unduly prolonged and should be terminated pursuant to 26 U.S.C. Sec. 641 and the Treasury Regulations.
 
 
 87
 It is established that equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law. Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746 (1957); First Nat'l Bank of Montgomery v. United States, 176 F.Supp. 768, 772 (M.D.Ala.1959), aff'd, 285 F.2d 123 (5th Cir.1961). Moreover, as to the question of whether an estate's administration had been "unduly prolonged," it is not surprising that the IRS might reach a different conclusion in 1981 than it reached in 1974.
 
 
 88
 Taxpayers also argue that the Government is "actually estopped" from treating the Estates as terminated because of its continued assessment and collection of taxes since 1976 from the Estates as well as from Earl and Betty Brown. They contend that "income taxes cannot be assessed against Estates that have been terminated and do not exist...."
 
 
 89
 Pending resolution of a tax dispute, the Commissioner is permitted to make inconsistent assessments against more than one taxpayer for the same tax liability if there is an accepted legal basis for each assertion. See Gerardo v. Commissioner, 552 F.2d 549, 555-56 (3d Cir.1977); Cannon v. Commissioner, 533 F.2d 959, 962 (5th Cir.1976) (Clark, J., dissenting), cert. denied, 430 U.S. 907, 97 S.Ct. 1177, 51 L.Ed.2d 583 (1977); Estate of Goodall v. Commissioner, 91 F.2d 775, 782-84 (8th Cir.), cert. denied, 393 U.S. 829, 89 S.Ct. 96, 21 L.Ed.2d 100 (1968). By invoking this procedure, the Commissioner acts, in effect, as a stakeholder. When the controversy is resolved, overpayments are returned to the proper parties, with interest to compensate them for the Government's interim use of the money. As long as resolution of the legal issues is consistent for all, and only one tax liability is ultimately retained, the Commissioner is justified in protecting the treasury.
 
 
 90
 In Estate of Goodall, Judge (now Justice) Blackmun explained:
 
 
 91
 [T]o compel the Commissioner to choose between good faith alternatives at the risk of later confrontation with the barrier of the statute of limitations, if his choice has been litigated and has not prevailed, could entail grave prejudice for the revenues and could result in a windfall to a taxpayer by way of escape from a just obligation otherwise due and collectible.
 
 
 92
 These are, after all, tax cases. Substantial sums are involved. The Commissioner is charged with the protection of the revenues. While these factors might be viewed as pragmatic, it would be unseemly, we feel, to force the Commissioner, in the performance of his administrative duties, to make an awesome choice of this kind at his peril. Taxes are not a game. Of course, the Commissioner, and the government itself, in this court is no more and no less than just another litigant. But we are aware of every person's tax responsibilities and we are not inclined to let the realization of revenues stand or fall on so technical a base as impeccable consistency. Consistency is desirable but its virtue has limits. Good faith inconsistency buttressed by acceptable argument, when considered in the framework of the Commissioner's responsibilities, cannot be regarded as an offense which provides a bar to bona fide tax litigation.
 
 
 93
 Estate of Goodall, 391 F.2d at 782-83. In the present case, the Commissioner acted properly in protecting the Government from an adverse judgment of Taxpayers' refund claims by assessing alternative and inconsistent income taxes against both the Estates and Taxpayers.
 
 III. CONCLUSION
 
 94
 We have reviewed Taxpayers other arguments, and found them to be similarly lacking in merit. Consequently, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 This case is a consolidation of interrelated complaints filed by Earl and Betty Brown, by Earl Brown as executor of his father's will and as executor of his mother's will, and by Susan Brown Barry (Brown's daughter), independently and as guardian of her two children, Brice Galt Barry and Andrew Earl Barry. For convenience, we will refer only to Earl and Betty Brown as appellants
 
 
 [2]
 Although the IRS concluded that all necessary administration of the Estates had ended much earlier, under a three year statute of limitations, the tax year beginning 1977 was the earliest point at which the IRS could assess a deficiency against Brown as beneficiary of the income
 
 
 [3]
 The IRS subsequently assessed deficiencies for the years 1979 through 1982
 
 
 [4]
 The amount originally pleaded was $121,123.32. Taxpayers twice amended their original complaint to include refund claims for tax years 1979-82. Taxpayers also claimed refunds based on alleged IRS errors other than the termination of the Estates; however, these subsidiary issues were settled between the parties prior to the district court's entry of final judgment
 
 
 [5]
 We briefly address, and reject, Taxpayers' argument that the district court erred in granting summary judgment for the defendant because the Government did not file an "Affidavit of facts." The decedents' wills were before the court and the facts regarding administrative duties completed and yet to be completed were undisputed. Likewise, the IRS procedures and conduct on which Taxpayers' estoppel arguments are based are not contested by the Government--at least to the extent that such matters are material to the legal outcome of this case. These uncontroverted facts were sufficient to allow the district court to reach legal conclusions that properly ended the litigation
 Taxpayers also complain that the district court granted summary judgment "sua sponte." We find this argument less than candid. The court's July 15, 1985 order, denying both parties' motions for summary judgment, was interlocutory. The court was free to later modify that order. Taxpayers received ample notice prior to--and during--the hearing on the parties' motions for reconsideration of the Government's intention to reurge its entire motion for summary judgment. Taxpayers' exhaustive briefs in this case afforded them the opportunity--of which they took full advantage--to respond to all of the Government's claims.
 
 
 [6]
 Subsection 641(a)(3) is the renumbered, but otherwise unchanged, version of 26 U.S.C. Sec. 161(a)(3) of the Internal Revenue Code of 1939
 
 
 [7]
 The complete regulation under the 1939 Internal Revenue Code reads as follows:
 The income of an estate of a deceased person, as dealt with in the Internal Revenue Code, is therein described as received by the estate during the period of administration or settlement thereof. The period of administration or settlement of the estate is the period required by the executor or administrator to perform the ordinary duties pertaining to administration, in particular the collection of assets and the payment of debts and legacies. It is the time actually required for this purpose, whether longer or shorter than the period specified in the local statute for the settlement of estates.
 Treas. Reg. Sec. 19.162-1 (1940).
 
 
 [8]
 Treasury Regulation Sec. 1.641(b)-3(a), unchanged since its promulgation in 1956, provides in pertinent part:
 The period of administration or settlement is the period actually required by the administrator or executor to perform the ordinary duties of administration, such as the collection of assets and the payment of debts, taxes, legacies, and bequests, whether the period required is longer or shorter than the period specified under the applicable local law for the settlement of estates.... However, the period of administration of an estate cannot be unduly prolonged. If the administration of an estate is unreasonably prolonged, the estate is considered terminated for Federal income tax purposes after the expiration of a reasonable period for the performance by the executor of all the duties of administration.
 Treas. Reg. Sec. 1.641(b)-3(a) (1956).
 
 
 [9]
 The Court stated:
 It is the will of Congress which controls, and the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nationwide scheme of taxation. State law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law.
 Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932) (citations omitted).
 
 
 [10]
 In general, estates are subject to the same rules as are provided for complex trusts in Subchapter C, with a few exceptions. One notable distinction is that estates are not subject to sections 665-668, the "throwback rules," which operate to prevent the use of accumulation trusts as tax-avoidance devices. Under the throwback rules, delayed distributions of accumulated trust income are taxed to beneficiaries at a rate approximately equal to the beneficiary's tax status in earlier years, when the accumulated income is deemed to have been distributed, allowing a credit for taxes paid by the trust when it received the income. One commentator has noted that
 [t]his exemption [of estates from the throwback rules] imbues decedents' estates with a tax-avoidance potential if undistributed income is taxed at a lower rate to the estate than would be paid by the beneficiaries on current distributions, providing an incentive to drag out the administration of a decedent's estate. To forestall this gambit, the regulations provide that an estate's existence for federal tax purposes terminates, at the latest, "after the expiration of a reasonable period for the performance by the executor of all the duties of administration."
 
 
 [3]
 B. Bittker, Federal Taxation of Income, Estates and Gifts p 81.8.1 (1981) (citing Treas. Reg. Sec. 1.641(b)-3(a))
 
 
 [11]
 Treas. Reg. Sec. 19.162-1 (1940). See note 7
 
 
 [12]
 For example, the court notes:
 The regulation does not use the expression "period reasonably necessary to administer or settle the estate" nor any other synonymous expression, and the purpose seems to be definitely inferable that if the administrator actually requires, or consumes, a long period in administering the estate, then for such period the income shall continue to be charged to the estate and not diminished by splitting the tax liability among the heirs, as would happen in the event of a distribution.
 Frederich, 145 F.2d at 798.
 
 
 [13]
 The court stated:
 [A]fter she had complied with the [independent administration] statute, by probating and recording the decedent's will and by filing an inventory, an appraisement and a list of claims of the estate, she acted directly under the powers granted to her by the will and without further interference by the probate court....
 Moreover, the petitioner had virtually complete authority to deal with the estate as she saw fit for in addition to the wide powers she enjoyed as an independent executrix she was also the sole beneficiary under the decedent's will. Thus, the petitioner ... at all times possessed the right to settle the estate with herself as the sole beneficiary without judicial sanction or the filing of a final report.
 Stewart v. Commissioner, 16 T.C. 1, 10-11 (1951), aff'd, 196 F.2d 397 (5th Cir.1952).
 
 
 [14]
 The Texas probate court also found that the wills of Earl and Ellen Brown both created trusts. The court entered a separate order relating to each will using identical language:
 Earl A. Brown, Jr., as Independent Executor of said Will and primary beneficiary thereunder, is fully qualified to manage and direct the business of said Estate and to dispose of said Assets and acquire other assets as he determines in his discretion to be in the best interest of the Estate, and to vest the assets of the Estate in the Trust created by said Will for the use and benefit of himself and the three hereinbefore mentioned contingent beneficiaries, Susan Brown Barry, Andrew Earl Barry, and Brice Galt Barry.
 As explained below, the result in this case does not turn on whether Brown's right to income from the Estates stems from a fee simple interest, a legal life estate, or an equitable life estate under a trust. Assuming the IRS properly considered the Estates terminated, the language of the probate court's order quoted above, finding that Brown is "primary beneficiary," supports assessment of income against Brown.
 
 
 [15]
 Federal courts have not looked favorably on taxpayer attempts to achieve post-death estate planning by employing nonadversary probate court proceedings that are essentially in the nature of consent decrees or advisory opinions. See Bosch, 387 U.S. at 471, 87 S.Ct. at 1785 (Douglas, J., dissenting); Old Kent Bank & Trust Co. v. United States, 362 F.2d 444, 450 (6th Cir.1966); First Nat'l Bank of Montgomery v. United States, 176 F.Supp. 768, 774-75 (M.D.Ala.1959), aff'd, 285 F.2d 123 (5th Cir.1961)
 
 
 [16]
 Taxpayers argue for the first time on appeal that these factual findings are based on an oral summary of the deposition of Brown, presented by counsel for the United States at the May 11, 1987, hearing on motions for summary judgment. Taxpayers complain that such deposition was not part of the record or before the judge when she entered judgment for the Government
 The United States deposed Brown in connection with this litigation, but did not file a copy of the deposition with the court. However, in its "Su pplemental Brief," dated April 9, 1987, the Government set forth the factua l assertions that Taxpayers now argue were improperly before the district c ourt. The Government specifically referred to Brown's deposition testimony as supporting these statements regarding the completion of administrative duties involved in winding up the Estates. The Government may have failed to attach a copy of the deposition to its brief, although it is listed as a n attachment. A copy of the deposition in question is contained in the Rec ord on Appeal, although no party to this appeal seems to be aware of that f act and consequently no party has proffered an explanation of how it got there.
 Taxpayers do not contend that the factual matters contained in the district court's order are inaccurate. Indeed, they could not credibly do so, as these probate facts and dates are largely matters of public record. Rather, they allege a procedural error, based on the district court's consideration of deposition testimony when the actual deposition was not before the court. Even if the district court's action rose to the level of error in this case, we find that the Taxpayers waived any irregularity below by failing to timely object.
 First, we note that the remarks of Government's counsel at the May 11, 1987, hearing involved undisputed facts. Taxpayers have never denied that, as early as the end of 1971, all the formal aspects of administration summarized by the Government at the hearing had been completed. We have reviewed Brown's deposition and find that the remarks of Government's counsel were not misleading; counsel's summary in essence reiterated the contents of its Supplemental Brief. Under these circumstances, if the court relied on the deposition summary in drafting its findings of facts, we cannot see how Taxpayers were substantially prejudiced.
 In any event, Taxpayers had ample opportunity below to object that Brown's deposition was not before the court, but failed to do so. An appropriate time to object would have been in response to the Government's Supplemental Brief, in which Brown's deposition testimony was referenced and summarized. Similarly, Taxpayers were represented by counsel at the May 11 hearing and yet failed to object when counsel for the United States orally summarized the deposition. Finally, Taxpayers filed a motion for reconsideration after the court entered its December 10, 1987, order and again failed to raise any objections to the "missing" deposition or to the court's findings of fact purportedly based on this deposition. We will not now entertain a contention of error that could have easily been remedied--if timely challenged--in the district court.
 
 
 [17]
 Taxpayers apparently do not pursue on appeal their argument below that the Estates require ongoing administration so that Brown, as independent executor, can prudently manage and invest the assets. In any event, it is clear that these functions could be performed equally well by Brown in his capacity as the primary beneficiary
 
 
 [18]
 Lucille Cathey died in 1979
 
 
 [19]
 Brown maintains that he has not distributed income from the Estates to himself; rather, he has made substantial payments to his daughter, Susan Barry, and her children. Under the wills, however, such payments represent at most a moral obligation. Regardless of the interpretation of Brown's maximum interest under the wills, at a minimum, Brown has the right to distribute all income from the Estates to himself during his lifetime. Whether he chooses to do so does not affect the tax issues involved in this case
 
 
 [20]
 Even if one or both of the wills of Brown's parents created trusts that are still in effect--a proposition we find dubious--under 26 U.S.C. Sec. 678, Brown would be the "substantial owner" because of his power to distribute to himself the income and, if necessary, the corpus of such trusts
 
 
 [21]
 Under Texas law, minerals are considered real property. Oil and gas royalties and bonuses are thus consideration for the sale of land. At common law, unless a well is "opened" prior to the time a life estate commences, royalties and bonuses are preserved for the remaindermen as principal. The life tenant commits waste if he appropriates royalties and bonuses as his own income, although he is entitled to the interest derived from investment of such proceeds. Clyde v. Hamilton, 414 S.W.2d 434, 439 (Tex.1967)
 
 
 [22]
 The Commissioner is free in a particular case, of course, to dispense with the detailed regulations that were promulgated for the Treasury's own protection. However,
 [t]he showing should be unmistakable that the Commissioner has in fact seen fit to dispense with his formal requirements and to examine the merits of the claim. It is not enough that in some roundabout way the facts supporting the claim may have reached him.... The evidence should be clear that the Commissioner understood the specific claim that was made....
 Angelus Milling Co. v. Commissioner, 325 U.S. 293, 297-98, 65 S.Ct. 1162, 1164-65, 89 L.Ed. 1619 (1945).
 
 
 [23]
 This is not a trifling complaint, as the record in this case consists of ten volumes and well over a thousand pages. See United States v. Ballard, 779 F.2d 287, 295 (5th Cir.) (party abandoned claims on appeal by failing to adequately brief issues, including a failure to provide references to the record), cert. denied, 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986)