**ESTATE OF Dorothy J. WARREN, Deceased, River Oaks Trust Company and R. Clay Underwood, Co–Administrators with will annexed of the Estate of Dorothy J. Warren, Deceased, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 91–4401.**

United States Court of Appeals, Fifth Circuit.

Jan. 13, 1993.

Thomas G. Gee, S. Stacy Eastland and Robert M. Weylandt, Baker & Botts, Houston, TX, for River Oaks Trust Co.

Teresa E. McLaughlin, Atty., Gary R. Allen, Chief, Nancy Morgan, Jonathan S. Cohen, Attys., Shirley D. Peterson, Asst. Atty. Gen., Dept. of Justice, Tax Div. Appellate Section and Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Washington, DC, for respondent-appellee.

Before REYNALDO G. GARZA, GARWOOD, and DUHÉ, Circuit Judges.

GARWOOD, Circuit Judge:

Petitioners-appellants, the estate of Dorothy J. Warren and its administrators (together, the Estate) appeal the judgment of the United States Tax Court essentially upholding the Internal Revenue Service's estate tax deficiency determination against the Estate. We reverse.

### Facts and Proceedings Below

The deceased, Dorothy J. Warren (Warren), a Texas resident, was a wealthy divorcee with several children and grandchildren, and an affinity for two catholic chari-

ties in Houston (the Charities). When she died on May 27, 1983, she left a will, executed in 1981, disposing of her estate, which at the time of her death had a gross value of approximately $28 million. Most of the estate's assets consisted of oil and gas leases, or interests therein, in Texas and Louisiana. Article V of the will put the bulk of the estate into two equal residuary trusts, the Charitable Lead Children's Trust and the Charitable Lead Grandchildren's Trust (the Trusts). The Trusts provided for a fixed annual annuity payment to the Charities for twenty years. The annuity amount was specified as "an amount equal to eight and one-half percent (8½%) of the initial net fair market value of the assets constituting the trust." The annuity amount was to be paid every year from trust income. If excess income were generated in a year, such excess was to be added to the trust corpus. If the income was not sufficient to pay the annuity amount, however, the balance would be paid out of the trust corpus.

At the end of twenty years, the remaining trust assets were to be distributed to the children and grandchildren. This arrangement was instituted primarily to further Warren's testamentary goals in a way that minimized the tax burden on the estate. The large guaranteed annuities to the Charities assured that much of the estate would qualify for the charitable bequest deduction of Internal Revenue Code (Code) § 2055(a) & (e)(2)(B), 26 U.S.C. § 2055(a) & (e)(2)(B) (West 1989).

Warren's will was admitted to probate in September 1983 in Probate Court No. 3 of Dallas County, Texas (the Probate Court). Between 1983 and 1987 approximately sixteen separate law suits were filed by or against the estate in the Probate Court, including suits by creditors and suits challenging the construction and administration of the will and estate. These suits involved, among others, all the beneficiaries and legatees of the will and dragged on for several years.

Because of the reorganization of several of the business enterprises that comprised a substantial part of Warren's assets, the administrative expenses incurred throughout the long course of the probate proceedings swelled to over $8.5 million by July 1988 and over $9 million by November 1989. Approximately $2 million of these expenses were paid from Estate principal. Due to the extended time involved, the Estate also realized substantial postmortem income from the Estate's assets.[1] Article III of Warren's will provided that:

> "All of my just debts, funeral expense, administration and testamentary expenses, and all estate, inheritance, transfer, and succession taxes ... shall be paid out of my residuary estate passing under Article V hereof, without apportionment."

Article V of the will states that " 'my residuary estate' " is to "consist of my entire testamentary estate after satisfaction of any gifts under Article IV hereof, and after payment of those debts, expenses, and taxes referred to in Article III hereof."

Because the huge administrative expenses, if deducted from the residuary corpus, would have substantially reduced the annuity amount, the Charities brought suit in the Probate Court claiming, *inter alia*, that these expenses should be paid out of residuary postmortem income rather than the residuary corpus.[2] The parties found

---

1. By "postmortem income" we mean income derived from estate assets between the time of Warren's death and the time the probate of her estate was substantially completed.

2. This postmortem income consisted largely of income from oil and gas holdings of a kind that the provisions of the Texas Trust Code, Tex. Prop.Code Ann. § 113.107(d) (West 1984) (formerly Vernon's Ann.Tex.Civ.Stat. art. 7425b–33), direct that trusts apportion 27½% (but not to exceed 50% of the net after deducting the prop-

erty's expense and carrying cost) to trust corpus and the balance to income. The Texas Trust Code also provides that "[i]f an asset becomes subject to a trust under a will, it becomes subject to the trust as of the date of the death of the testator, even though there is an intervening period of administration of the testator's estate," Tex.Prop.Code § 113.103(a) (formerly Vernon's Ann.Civ.Stat. art. 7425b–28) and that "[i]f the provisions of ... [the Texas Trust Code] and the terms of a trust conflict, the terms of the trust control." *Id.* § 111.002(a). Article II of the

ambiguity in the will's use of the terms "residuary estate" and "initial net fair market value" and argued extensively about whether the administrative expenses should be charged to the residuary corpus or postmortem income.

The parties to most of the suits, including the administrators, the Charities, the children and grandchildren, and most claimants against the Estate, were finally able to reach a settlement of their claims in July 1987. Included in this omnibus settlement was a provision that Article III of the will would be restated to allocate payment of all administrative expenses out of the residuary postmortem income, not out of the residuary corpus.

The Probate Court modified and approved the settlement and entered an agreed final judgment in September 1988. The Probate Court found that because (i) the income from the oil and gas interests would be allocated 27½% to principal and 72½% to income,[3] and (ii) the postmortem income was the only liquid asset available to the residuary estate to pay the administrative expenses, the administrative expenses should be allocated accordingly. Thus, the agreed final judgment provided that 27½% of the administrative expenses would be charged to the residuary corpus

and 72½% of the administrative expenses would be charged to residuary postmortem income.[4] It was also provided that the annuity amount would in no event be less than $1,471,575.81 per year.

Respondent-appellee, the Commissioner of Internal Revenue (the Commissioner), having asserted an estate tax deficiency, the Estate filed a petition for redetermination in the Tax Court. Most of the issues were settled.[5] However, there remained for trial the issue of whether in calculating the amount of the estate tax charitable deduction for the bequest to the Trusts under Article V of the will the amount of "the initial net fair market value of the assets constituting the" Trusts should be reduced by one hundred percent of the Estate's administrative expenses, as claimed by the Commissioner, or only by the 27½% thereof pursuant to the Probate Court's judgment, as asserted by the Estate. The Tax Court agreed with the Commissioner, determining that it was not bound by the Probate Court's judgment and that under Texas law Warren's will required that all the administrative expenses be charged to the residuary corpus before computing "the initial net fair market value of the assets constituting the trust," eight-and-one-half percent of which

Will granted the estate's personal representative, among other things, "all of the rights and powers conferred upon a trustee by the Texas Trust Act and other laws of Texas." Texas Property Code Ann. § 113.019 (West 1984) (formerly Vernon's Ann.Tex.Civ.Stat. art. 7425b–25) grants trustees the power to compromise and settle claims.

3. See note 2, *supra.*

4. The judgment provided that the will's Article V "the initial net fair market value of the assets constituting" each of the two Trusts would be one-half of the amount calculated as follows, *viz,* the total gross estate as calculated for federal estate tax purposes less the specific bequests in Article IV, less 27½% of the administrative expenses paid to date, and less all of each of the following: funeral expenses, debts of decedent, mortgages and liens, and federal estate taxes and state death taxes.

5. The initial estate tax return filed by the Estate in 1984 left many of the crucial items blank or "undetermined." The Commissioner issued a

notice of deficiency in the amount of $34,340,-734.68, which the government's brief states was "based largely on the values for the assets and debts of the estate contained in the Marriage Settlement Agreement between the decedent and her former husband that had been executed the year before her death," although the Estate asserts that "the bulk" of the deficiency "resulted from" the Commissioner's position that the Charities "were not qualified charitable organizations." In any event, it was eventually agreed: that the value of the total gross estate for estate tax purposes was $28,352,319.92; that as of July 31, 1988, the Estate had incurred and paid $8,523,834.44 ($9,085,849.61 as of November 28, 1984) in administrative expenses and that such expenses were allowable as a deduction for estate tax purposes under Code § 2053(a)(2) to the extent the Estate elected to so deduct them (and not to deduct them for income tax purposes, see Code § 642(g)); that the Charities were qualified charities for the purposes of the estate tax charitable deduction (Code § 2055(a)); and that the Article V bequest to the Charities was in the form of a guaranteed annuity for purposes of Code § 2055(e)(2)(B).

was to constitute the annual annuity amount payable to the Charities over the twenty-year term. Following the Tax Court's opinion, final judgment was entered on the basis of an agreed "Computation For Entry of Decision." The effect of the Tax Court's decision was to reduce the amount of the annual annuity payable to the Charities, for purposes of the estate tax charitable deduction, from some $1,471,575, under the Probate Court's judgment, to $878,131, with a consequent reduction in the estate tax charitable deduction from some $16,878,827 to $10,072,070.[6] The Estate timely perfected this appeal.

## Discussion

In determining that it was not bound by the decision of the Texas Probate Court in allocating administrative expenses, the Tax Court relied on *C.I.R. v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

In *Bosch*, and its companion case of *Second National Bank of New Haven v. United States*, the Supreme Court reviewed decisions of the Second Circuit from New York and Connecticut, respectively *C.I.R. v. Estate of Bosch*, 363 F.2d 1009 (1966), and *Second National Bank of New Haven v. United States*, 351 F.2d 489 (1965), in which the estate tax marital deduction was at issue. The New York case involved a revocable trust established by the decedent in which his surviving spouse had had a life estate with a general power of appointment as to which she subsequently, but before his death, executed an instrument purporting to release the general power and convert it into a special power. The Commissioner disallowed the marital deduction because the surviving spouse did not have a general power of appointment, due to the release instrument. While the

case was pending in the Tax Court, the estate filed a proceeding in a New York trial court to declare the release a nullity, and the New York trial court so declared it. As the Second Circuit's opinion reflects, it was conceded that the state proceeding was brought at least partially for the purpose of affecting the outcome of the Tax Court case, all concerned in the state case took the position there that the release was a nullity, and no contrary argument was presented to the state court. *Bosch*, 363 F.2d at 1011. The Tax Court and the Second Circuit, over Judge Friendly's dissent, held for the estate on the basis of the state trial court judgment, even though it was recognized that the state proceedings were essentially "non-adversary." *Id.* at 1013. The Connecticut case involved a dispute as to the amount of the marital deduction, which turned on whether the state statute apportioning estate and inheritance taxes in the absence of a contrary provision in the will applied, with a greater marital deduction resulting if the statute applied. After the Commissioner asserted a deficiency based on the inapplicability of the apportionment statute, the executor filed an application in the Connecticut Probate Court to have the estate taxes prorated under the statute, and all charged against the trust for the grandchildren rather than the marital deduction trust. Others interested in the estate, including the other beneficiaries under the will, though cited, did not contest the application, and some filed statements of no objection. The Probate Court granted the application. *Bosch*, 387 U.S. at 459, 87 S.Ct. at 1780. The Second Circuit ultimately affirmed a summary judgment in favor of the Internal Revenue Service (IRS) on this issue, holding that the will unambiguously reflected that the state proration statute would not apply, and that the Probate Court's contrary decision did not require a different result, noting that

---

**6.** The Computation For Entry of Decision calculated the estate tax charitable deduction amount as 11.4699 times the amount of the 8½% annual annuity, or 97.49415% (8½% × 11.4699) of the corpus of the Trusts ($10,330,948.61 after deducting from the residuary estate, *inter alia*, all the $9,085,849.61 in administrative expenses). See 26 C.F.R. §§ 20.2031–10 (Table B), 20.2055–2(e)(2)(vi), 20.2055–2(f)(2)(iv). The allowed estate tax deductions also included $3,855.05 fu-

neral expenses, $1,656,925.75 debts, $4,809,843 mortgages and liens, and $9,085,849.61 administrative expenses (exclusive of interest). The Estate received the right, in the event the Tax Court's decision were reversed, to deduct less than all of such administrative expenses for estate tax purposes, presumably so that in that event it could instead deduct such expenses for income tax purposes. See Code § 642(g).

the judges of such courts are laymen and their decisions "are even subject to collateral attack in another probate district." *Second National Bank of New Haven*, 351 F.2d at 494.

The Supreme Court affirmed in the Connecticut case and remanded to the Second Circuit in the New York case, holding that the respective state trial court decisions were not to be given "controlling" effect. *Bosch*, 387 U.S. at 463, 87 S.Ct. at 1782.

The Supreme Court initially noted that "at least three positions have emerged among the circuits" respecting the effect of state trial court decrees "where the matter decided there is determinative of federal estate tax consequences." *Id.* at 462, 87 S.Ct. at 1781. It next described these positions without evaluating them. The first it characterized as treating the state court ruling as decisive if the issue was "fairly presented for its independent decision" and was "binding upon the parties under the state law." *Id.* The second position, characterized as "[t]he opposite view" and one which "seems to approach" the methodology employed in diversity cases to determine state law, was that the federal courts would be bound by the state court ruling "only after independent examination of the state law as determined by the highest court of the State." *Id.* The third view, advocated by the government as "an intermediate position," was that "a state trial court adjudication is binding in such cases only when the judgment is the result of an adversary proceeding in the state court." *Id.* at 463, 87 S.Ct. at 1782.

The next paragraph of the Court's opinion commences by stating "[w]e look at the problem differently." *Id.* The Court explains "[f]irst" that neither *res judicata* nor *collateral estoppel* apply to the cases before it because the Commissioner was not a party to either of the state court proceedings. It then observes that "both state proceedings were brought for the purpose of directly affecting federal estate tax liability." *Id.* "Next" the opinion points out that because the issue before it involves "a federal taxing statute," the Court "must look to the legislative history surrounding it," and then observes:

"the report of the Senate Finance Committee recommending enactment of the marital deduction used very guarded language in referring to the very question involved here. It said that 'proper regard,' not finality, 'should be given to interpretations of the will' by state courts and then only when entered by a court 'in a bona fide adversary proceeding.' S.Rep. No. 1013, Pt. 2, 80th Cong., 2d Sess., 4. We cannot say that the authors of this directive intended that the decrees of state trial courts were to be conclusive and binding on the computation of the federal estate tax as levied by the Congress. If the Congress had intended state trial court determinations to have that effect on the federal actions, it certainly would have said so—which it did not do. On the contrary, we believe it intended the marital deduction to be strictly construed and applied. Not only did it indicate that only 'proper regard' was to be accorded state decrees but it placed specific limitations on the allowance of the deduction as set out in § 2056(b), (c), and (d)." *Id.*

The Court goes on to say that "[t]his is also in keeping with ... the Rules of Decision Act, 28 U.S.C. § 1652" and the Court's precedents holding that "even in diversity cases" decisions of " 'lower state courts' " though " 'attributed some weight' " are not " 'controlling' " if "the highest court of the State has not spoken on the point." *Id.* It then notes that:

"[t]his is not a diversity case but the same principle may be applied for the same reasons, *viz.*, the underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *Id.* at 465, 87 S.Ct. at 1783.

The concluding substantive paragraph of *Bosch* states "[w]e believe that this would avoid much of the uncertainty that would result from the 'non-adversary' approach

and at the same time would be fair to the taxpayer and protect the federal revenue as well." *Id.*

The precise scope and meaning of *Bosch* as applied in dissimilar contexts is difficult for us to ascertain. The Court's language "[w]e look at the problem differently" suggests that it was not entirely agreeing with any of the three general positions described, but not evaluated, in the immediately preceding paragraph of the opinion. Later language in the opinion, however, indicates that it was adopting the second position (although it never expressly so states). Was the Court, perhaps, leaving open the proper approach in other contexts, such as federal tax consequences not relating to the marital deduction, which is so heavily emphasized as a ground for decision? We note in this connection that *Bosch* distinguished *Blair v. Commissioner*, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937), an income tax case, on the ground that it "involved the question of a property right determination by a state appellate court." *Bosch*, at 462 n. 3, 87 S.Ct. at 1781 n. 3. *Bosch* also involved state trial court decrees in cases brought by the taxpayer "for the purpose of directly affecting federal estate tax liability." Moreover, the opinion makes clear that adversarial positions were not taken by the parties in the state cases, notwithstanding its seeming rejection of "the 'non-adversary' approach." Some authorities have concluded that *Bosch* does not vitiate the significance of *bona fide* adversarial settlements. *See Waldrup v. United States*, 499 F.Supp. 820, 824 n. 4 (N.D.Miss.1980); *but see Estate of Brandon v. C.I.R.*, 828 F.2d 493,

499 (8th Cir.1987) (marital deduction case; *Bosch* applies to good faith adversary settlements).

In the estate tax charitable deduction area, though without citing *Bosch*, controlling effect has frequently been given to *bona fide* settlements of adversarial litigation not instituted for tax purposes. *See Flanagan v. United States*, 810 F.2d 930 (10th Cir.1987); *Estate of Strock v. United States*, 655 F.Supp. 1334 (W.D.Pa.1987); *Northern Trust Co. v. United States*, 41 A.F.T.R.2d 78–1523 (N.D.Ill.1977); [7] Rev. Rul. 89–31, 1989–1, C.B. 277 (revoking prior contrary ruling and holding "[i]n situations involving settlements of bona fide will contests the Service will no longer challenge the deductibility of immediate payments to charities solely on the ground that they were made in lieu of a split interest [provided for in the will] that would not constitute an allowable deduction under section 2055(e)(2) of the [Internal Revenue] Code"); Technical Advice Memorandum 8948004 (August 25, 1989).[8]

In *Brown v. United States*, 890 F.2d 1329, 1341–43 (5th Cir.1989), we considered *Bosch* and ultimately concluded that "[t]he relevance of a state court's judgment to the resolution of a federal tax question will vary, depending on the particular tax statute involved as well as the nature of the state proceeding that produced the judgment." *Id.* at 1342.[9] We apply that test here and conclude that the Tax Court erred by not giving effect to the Probate Court judgment.

The tax statute involved here is the provision for estate tax charitable deduction, Code § 2055. In this respect, we are aware

---

**7.** *Northern Trust Co.* has frequently been cited with approval. *See, e.g., Oetting v. United States*, 712 F.2d 358, 361 (8th Cir.1983); *First National Bank of Fayetteville v. United States*, 727 F.2d 741, 748 (8th Cir.1984); Rev.Rul. 89–31, 1989–1, C.B. 277.

**8.** This directive applied Rev.Rul. 89–31 to a situation where the *bona fide* settlement not only gave the charity an immediate payment in lieu of the nonqualifying split interest provided for it in the will, but also provided that the charity would be exonerated from paying any portion of the estate taxes notwithstanding that the "will specifically provides that estate taxes are to be paid out of the charitable residue as an expense of administration without apportionment." In

reaching this result it is stated "[a] bona fide settlement agreement results in a restructuring of the terms of the will so that the beneficiaries' interests are based on the restructured will. See Rev.Rul. 89–31, *supra*. Thus the provisions of a bona fide settlement agreement prevail over the provisions of the will."

**9.** In *Brown* we held the Texas Probate Court order finding that the estate, administered by an independent executor, required ongoing management and administration, did not preclude the Commissioner from determining under Treasury Regulation 1.641(b)–(3)(a) that administration of the estate had already been unduly prolonged. We noted that the executor did not

of no legislative history comparable to that cited in *Bosch* with respect to the effect of state court decrees.[10] However, as has been frequently recognized, "[i]n enacting the charitable deduction provisions in I.R.C. § 2055 and its predecessors, Congress sought to encourage gifts to charity." *Flanagan* at 934. Typically, in upholding charitable deductions based on court approved *bona fide* settlements of adversarial positions, the decisions have stressed that "[t]he deduction is sought for the actual benefit passing to the charitable foundation." *Id.* at 935. *See also Oetting v. United States*, 712 F.2d 358 at 363 (8th Cir.1983) ("A deduction is claimed only for those amounts that were actually received by the four charities. The deduction should be allowed.").[11] That is the situation here, as the Estate seeks a deduction only on the basis of what the Charities will actually receive from the Estate. Of course, for purposes of section 2055 what is received must be received *from the decedent,* and not merely from those who take the decedent's estate. But where the settlement is a *bona fide* resolution of a truly adversarial dispute as to rights of the charity under a will of the decedent, then the foregoing requirement would appear to be satisfied, for in such a case what the charity receives it receives *as a result and by virtue of* the provision made for it in the decedent's will, whether or not it receives precisely what it would be entitled to if no settlement had been made. The contrary conclusion would be necessarily inconsistent with Rev.Rul. 89–31 as well as with such decisions as *Flanagan, Northern Trust Co.,* and *Estate of Strock. See also Dumont's Estate v. C.I.R.,* 150 F.2d 691, 692–94 (3d Cir.1945).

We further note that the settlement and Probate Court judgment are wholly valid and binding under Texas law, and under Texas law control the extent to which the administrative expenses are charged to the residuary estate for purposes of computing "the initial net fair market value of the assets constituting" the Trusts. *See Mooney v. Harlin,* 622 S.W.2d 83, 85 (Tex.1981) (binding nature of Texas Probate Court judgments, which are *in rem* ). Texas law has long recognized the "family settlement doctrine." As stated in *Matter of Estate of Hodges,* 725 S.W.2d 265, 267 (Tex.App.—Amarillo, 1986, writ ref'd n.r.e.):

> "A family settlement agreement is an alternative method of administration in Texas that is a favorite of the law. *Salmon v. Salmon,* 395 S.W.2d 29, 32 (Tex.1965); *Estate of Morris,* 577 S.W.2d 748, 755–56 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.). The theory underlying the validity of family settlement is stated in *Pitner v. United States,* 388 F.2d 651, 656 (5th Cir.1967):
>
>> 'This approach is made possible by section 37 of the [Texas] Probate Code which provides that when a person dies leaving a will, [ ...] "all of his estate devised or bequeathed by such will shall vest immediately in the devisees or legatees;" [...] subject to the payment of the decedent's debts. This provision leaves the beneficiaries of an estate free to arrange among themselves for the distribution of the estate and for the payment of expenses from that estate.' " (Footnote omitted).

*See also Cook v. Hamer,* 158 Tex. 164, 309 S.W.2d 54, 56 (1958); *Wade v. Wade,* 140 Tex. 339, 167 S.W.2d 1008, 1010 (1943); *Everett v. Everett,* 309 S.W.2d 893, 896 (Tex.Civ.App.—Waco 1958, writ ref'd

---

file the probate proceeding until after the deficiency notice, *id.* at 1341, "the nonadversary quality" of that proceeding, and the fact that the Probate Court "was not presented with all the relevant facts and differing views." *Id.* at 1342. We further observed "[n]ot only was there no genuine controversy involved, the probate court's order was unnecessary" and "had no practical consequences apart from this federal tax controversy." *Id.* We held it was thus "entitled to little weight." *Id.*

**10.** Nor are we aware of any federal estate tax requirement or preference for charging administrative expenses to residuary corpus.

**11.** *Cf. Estate of Wright v. United States,* 677 F.2d 53 (9th Cir.1982) ("The paramount concern, for federal tax purposes, is with the real distribution of the funds rather than their nominal source," at 54, and, "'the amount to be deducted for charitable gifts must be computed on the basis of what the charities actually received, not on the basis of what is provided in the will,'" at 55).

n.r.e.). In *Pitner* we applied the Texas family settlement doctrine in holding that certain postmortem attorneys' fees were deductible for estate tax purposes as administrative expenses under Code § 2053(a)(2). *Pitner v. United States*, 388 F.2d 651 (5th Cir.1967).

Though the Tax Court in this case specifically refused to make a finding as to whether the agreed allocation of administrative expenses was a settlement of a bona fide dispute, the Commissioner argues precisely this point on appeal. He claims, as he did below, that the settlement, at least as far as it dealt with the allocation of administrative expenses, was collusive and designed simply to avoid payment of taxes, and that the IRS should not now be forced to abide by a settlement in which it had no voice.

We reject the Commissioner's argument. This contention was thoroughly tried below, and, as the Estate points out, the Commissioner never produced any evidence with which to question the character of the proceedings. The Estate, on the other hand, presented the testimony of Alan Leibel, an attorney who represented Warren's children throughout the litigation in the Probate Court. Leibel testified that the negotiations, on the administrative expense issue as well as others, were protracted and adversarial.

It is indisputably clear that the litigation, and its settlement, were to resolve adversarial, nontax, *bona fide* disputes between the parties.

We also note that the terms of the will provide independent verification of the adversarial interests involved in the probate contest. If all administrative expenses had been taken out of the corpus of the residuary estate so that "the initial net fair market value" of the assets of the Trusts would have been lower, the annuity amount received by the Charities would likewise have been lower. This would have benefited the children and grandchildren because less of the estate would have been paid out to the Charities and more would have been left to them after the twenty-year term of the Trusts.

As calculated by the Commissioner and under the Tax Court's judgment, the annuity payments to the Charities were $878,131 a year, as compared to $1,471,576 per year under the Probate Court's judgment, a difference of $593,445 a year. Over the 20-year term this would amount to $11,868,904 more going to the Charities, and the same amount less being available to Warren's children and grandchildren at the termination of the Trusts (the children and grandchildren receiving nothing from the Trusts prior to their termination).

The Commissioner's brief makes the conclusory assertion that because "[t]he net effect of this allocation of administrative expenses was to reduce both the federal estate and income tax burdens of the estate" the settlement "was not adverse to the interests of the various parties to" it and hence was not *bona fide* and adversarial. The record simply does not bear this out. The Commissioner's position and that of the Tax Court reduced the amount of the estate tax charitable deduction by approximately $6,806,756 from what it would have been had the Probate Court judgment been followed.[12] Even as calculated by the Commissioner, the net taxable estate was only $2,357,320, and so the maximum estate tax rate would have been 49%. Code § 2001(c)(1). Of course, if the Probate Court position were applied, the same estate tax liability as resulted from the Tax Court's judgment could be achieved without using as an estate tax deduction some $6,806,756 (the amount of the decrease in the estate tax charitable deduction) of administrative expenses, which in turn would free that amount up to take as an estate income tax deduction.[13] The maximum income tax rate for estates and trusts during 1983 through 1986 was fifty percent and has been less ever since. Code § 1(e). Consequently, the tax benefits—estate tax and income tax—in regard to the adminis-

---

12. The $593,445 difference in the annual annuity amount times the appropriate 11.4699 factor (see note 6, *supra*) equals $6,806,756.

13. Under Code § 642(g) an item of administrative expense may not be taken both as an estate tax and as an income tax deduction.

trative expenses and the estate tax charitable deduction could not have amounted in all to more than half the amount of the difference in the size of the estate tax charitable deduction, or some $3,403,378 (½ of $6,806,756). In addition to this tax benefit, there would be, if the Probate Court judgment were followed, the potential for increased annual income tax deductions by the virtue of the increase in the amount of the annual annuity payable to the Charities by $593,445. Even on the unlikely assumption that there would be sufficient net taxable income to realize the full potential of this increased deduction (in addition to the hypothesized income tax deduction for administrative expenses), over the 20–year term it would not amount to a tax saving of over some $4,255,000.[14] The total of the maximum potential estate and income tax savings from administrative expenses, $3,403,378, plus the maximum potential income tax savings from the increased charitable deduction for increased annuity payments to charity, $4,255,000, would thus be less than $7,660,000. This would still leave more than $4,000,000 ($11,868,904, the pretax loss to the children and grandchildren, less $7,660,000 in maximum potential tax savings, the benefit of which could accrue to them on termination of the Trusts) to fight over. That is a substantial sum, and a substantial fraction of the net estate. The Commissioner has presented no calculations whatever to demonstrate what the potential tax savings would be or that they would even approach the amount of the enhancement in the position of the Charities to the detriment of the children and grandchildren.

The record as a whole affirmatively demonstrates that the dispute was a truly adversarial, nontax one and that the parties reached an arms-length and *bona fide* settlement of that dispute that was essentially approved by the Probate Court, and that what the Charities received in the settlement and under the Probate Court judgment accrued to them by virtue and as a result of the bequest to them in Article V of the will. There is no substantial evidence in the record to sustain a contrary finding. Consequently, there is no need for a remand to the Tax Court for a fact finding on that issue. We further determine that the settlement and Probate Court decree are valid and binding under Texas law, particularly the Texas family settlement doctrine. In these circumstances, we conclude that the approach of Rev.Rul. 89–31, rather than of *Bosch*, is appropriate, and that the estate tax charitable deduction should be computed on the basis of what the Charities will receive under Article V of the will pursuant to the Probate Court's judgment.

### Conclusion

We hold that the estate tax charitable deduction must be computed on the basis of what the Charities will receive under Article V of the will pursuant to the Probate Court's judgment, and that the Tax Court erred in holding to the contrary. We accordingly reverse the judgment of the Tax Court and remand the case to that court for further proceedings consistent herewith, including recalculation of the appropriate estate tax in conformity with our holding.

JUDGMENT REVERSED; CAUSE REMANDED

**14.** The top income tax for estates in the years 1983 through 1986 was 50%; in 1987 through 1990 it did not exceed 38.5%; since then it has not exceeded 31%. See Code § 1. Assuming 3.6 years (May 27, 1983 through December 1986) at 50%, 4 years at 38.5%, and 12.4 years at 31%, the total income tax savings over the 20 years from the increased income tax charitable deduction would be approximately $4,253,328, calculated as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| 3.6 | × $593,445 | = $2,136,440.20 | × .50 | = $1,068,220.10 | | |
| 4 | × $593,445 | = $2,373,780 | × .385 | = $ 913,905.30 | | |
| 12.4 | × $593,445 | = $7,358,718 | × .31 | = $2,281,202.58 | | |

TOTAL        $4,253,327.98