REVISED OCTOBER 12, 2001

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-60489

_____

ESTATE OF HELEN BOLTON JAMESON, DECEASED,
NORTHERN TRUST BANK OF TEXAS, N.A., INDEPENDENT EXECUTOR

Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE

Respondent-Appellee.

_____

On Appeal from the United States Tax Court
_____

September 18, 2001

Before JONES, DeMOSS, and BENAVIDES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Estate of Helen Jameson appeals following a Tax Court decision assessing a deficiency against it. The Estate argues that the Tax Court clearly erred in valuing assets of Johnco, Inc. ("Johnco"), a holding company that is part of the estate. It also raises a plausible but unsustainable constitutional challenge to the estate tax as applied in this case. As we agree that the court's valuations were in error, we vacate and remand for further proceedings.

## I.  FACTS

This dispute arises from a series of bequests from John Jameson to his wife Helen Jameson, and from Helen to their children Andrew and Dinah Jameson.

### A.  Mr. Jameson's Bequest of Johnco Shares to Andrew and Helen.

Mr. Jameson incorporated the privately held holding company Johnco in 1968.  At his death in May 1990, he owned 82,865 of Johnco's 83,000 shares as separate property.  In his will, Mr. Jameson bequeathed $106,251 in Johnco shares to Andrew to fund a unified estate tax credit, directing that the shares be "valued by independent appraisal as of my date of death."  The remainder of Mr. Jameson's shares passed to his wife.

Helen, the initial executrix of Mr. Jameson's estate, filed an estate tax return in which she reported the value of the Johnco stock passing through the estate at $86.80 per share.  The source of this share value is unclear.  This tax return was never amended.

Helen died in September 1991.  Northern Trust Bank of Texas ("Northern Trust") became the executor of both spouses' estates.  Northern Trust asked Rauscher Pierce Refsnes, Inc. ("Rauscher") to appraise both estates in December 1992.  Although the appraisal of Mr. Jameson's estate is not in the record, its conclusion that Johnco shares were worth only $44.65 per share at the time of his death appears in his wife's estate appraisal.

2

Northern Trust used the $44.65 figure to calculate that Andrew was entitled to 2,380 Johnco shares to satisfy the $106,251 he was entitled to receive under Mr. Jameson's will. Northern Trust concluded that Helen received John's remaining 80,485 shares of Johnco. Had Northern Trust used the $86.80 share value, Andrew would have received 1,224 shares and Mrs. Jameson would have received 81,641 shares.

**B.    The Family Settlement Agreement.**

Mrs. Jameson left Andrew and Dinah equal shares of her estate. The siblings entered into a December 1993 settlement agreement ("Family Settlement Agreement") dividing her estate. Separate counsel represented Andrew and Dinah during the negotiations.

The Family Settlement Agreement assigned a value of $4.025 million to Mrs. Jameson's estate's 80,485 shares of Johnco and gave the shares to Andrew. This established an implicit per share value of $ 50.01. Dinah received $ 4.025 million in cash, marketable securities, and other assets.

**C.    Johnco's Timber Property.**

Johnco's principal asset is 5,405 acres of timberland in Louisiana (the "Timber Property") that it acquired in 1986. The company does not harvest or transport its own timber. Rather, Johnco earns over 80% of its revenue by receiving fees from companies that harvest timber on the property. The Timber Property's gross revenues averaged roughly $154,000 annually from

3

1988-91.[1]  Johnco's average net income over this period was $60,803.  The parties stipulated that the Timber Property was "well-managed."

Northern Trust commissioned an appraisal of the Timber Property by consultant forester George Screpetis in 1992. Screpetis noted that the Timber Property was outstanding for timber production and opined that a buyer of the property would most likely be a company in the forest products business.

Forester Robert Baker prepared a 1996 report on the Timber Property on behalf of the IRS.  The report stated that the Timber Property was extremely productive and that its best use was for timber production.  Commending Johnco's management of the property, the report predicted that private investors, pension funds, or local timber companies would be most likely to purchase it.

Harold Elliott, a consulting forester who had worked for the Jamesons for many years, testified at trial that Johnco's management was interested primarily in covering expenses and not in making a big profit.  Elliott testified that Johnco cut timber conservatively.  He also testified that timber grew on the property

---

[1]    The parties stipulated to Johnco gross revenue figures that averaged $192,480 over the preceding four years.  Since the Timber Property accounted for about 80% of these revenues, the property's average revenues should have been roughly $154,000.

4

at the rate of 8 to 10% a year.

The parties stipulated that, at Mrs. Jameson's death, Johnco had a basis of $217,850 in the Timber Property and that the property was worth $6 million. At trial, the parties disputed how the value of Johnco's interest in the Timber Property was affected by the capital gains taxes the company would incur through timber or land sales.

Both parties presented expert reports and testimony on Johnco's fair market value given its low basis in the Timber Property. Clyde Buck, a managing director of Rauscher, prepared a new appraisal on behalf of the estate ("New Rauscher Appraisal"). This appraisal considered three possible scenarios for a buyer of Johnco under discount rates ranging from 20 to 30%: 1) an immediate "fire sale" of the Timber Property; 2) a rapid but controlled sale of Timber Property parcels within twenty-four months; and 3) ongoing operation of the Timber Property.

Buck testified that he had no information that Johnco was operating in a wasteful manner. Based on the stipulation that the Timber Property was worth $ 6 million, however, Buck concluded that a buyer of Johnco would realize the most income through an immediate liquidation. On the other hand, a buyer would realize the least income by far if it operated the Timber Property as a going concern. After subtracting the taxes that a buyer would incur by immediately selling the Timber Property, Buck concluded that Johnco's interest in the property was worth only $4.8 million.

5

John Lax of Arthur Andersen LLP also presented an appraisal on behalf of Mrs. Jameson's Estate ("Andersen Appraisal"). Lax estimated the debt payments a potential buyer would incur if it financed $5 million of Johnco's purchase price. He concluded that Johnco's projected future cash flow would not cover the debt payments. He also asserted that a buyer would demand a return on equity of 17-22% for a risky investment like the Timber Property. Lax concluded that a buyer of Johnco would liquidate the Timber Property within a year. After calculating capital gains taxes based on this conclusion, Lax determined that Johnco's interest in the Timber Property was worth only $4.13 million.

Francis Burns then testified and presented a report on behalf of the IRS. Burns was a principal in the financial consulting firm IPC Group LLC. Burns argued against any capital gains discount based on an immediate liquidation of the Timber Property by a buyer of Johnco. He stated that this discount was counterintuitive, since it assumed that an entity would purchase Johnco and then "immediately turn around and sell what [it] just purchased."

D.  **Johnco's Tanglewood Property.**

Johnco also owned a parcel of unimproved land in Harris County, Texas (the "Tanglewood Property"). The parties stipulated that this property was worth $240,000 at Helen's death, and that Johnco held a basis of $110,740 in it.

6

Mrs. Jameson's Estate did not specifically indicate that a buyer of Johnco would immediately liquidate the Tanglewood Property, but the New Rauscher Appraisal incorporated the value of this property when it calculated a capital gains discount for Johnco's assets. Thus, this appraisal assumed that a buyer of Johnco would realize capital gains through an immediate sale of the Tanglewood Property.

**E. The Tax Court decision.**

The Tax Court first considered the number of Johnco shares that passed to Mrs. Jameson's Estate after John's bequest of $106,251 in Johnco shares to Andrew. The court observed that the $44.65 appraised share value used by Helen's estate managers conflicted with the $86.80 share value reported on Mr. Jameson's estate tax return. The court also noted that the $44.65 share value reduced Mr. Jameson's property available for a marital deduction, and it opined that Mr. Jameson's will intended to maximize this deduction. While noting that the 1992 appraisal of Mr. Jameson's estate was not in the record, the court expressed doubt about Rauscher's valuation methodologies. The court applied the $86.80 share value and concluded that Mrs. Jameson's Estate owned 81,641 Johnco shares.

The Tax Court then turned to valuing Johnco. Although the court acknowledged that Andrew and Dinah negotiated the 1993 Family Settlement Agreement at arm's length, it refused to adopt the share value adopted in that agreement since the agreement

7

relied on the Rauscher appraisal, and the appraisal was flawed because it assumed a liquidation of the Timber Property.

The court then considered capital gains tax discounts for Johnco's assets based on the company's low basis in them. It refused to apply a discount for the Tanglewood Property, stating that the parties had failed to address this issue. The court did decide to apply a discount for the capital gains tax liability that Johnco would incur from ongoing sales of timber. It rejected a discount reflecting an immediate sale of the Timber Property, however, concluding that a buyer would operate the property on an ongoing basis.

The court designed a model to estimate the capital gains taxes that Johnco would incur if it operated the Timber Property as a going concern. The parties had not presented evidence on this specific issue. The court's model assumed that Johnco would sell 10% of its timber annually to follow a sustainable yield pattern and that a 4% rate of inflation would apply. Along with these assumptions, the model estimated that the Timber Property would realize $600,000 in revenues in year one and similar inflation-adjusted revenues in later years. It applied a 20% discount rate, within the range of the taxpayer's expert estimates, and determined that the present value of capital gains taxes Johnco would

8

eventually pay is approximately $873,000.  Consequently, Johnco's interest in the Timber Property was worth roughly $5.1 million.[2]

Based on its conclusions, the Tax Court found that Johnco shares were worth $71 each and assessed a deficiency against Mrs. Jameson's Estate, which has appealed.

## II.  STANDARD OF REVIEW

We review the Tax Court's factual findings for clear error.  Estate of Clayton v. Comm'r, 976 F.2d 1486, 1490 (5th Cir. 1992).  Clear error exists if this court is left with a definite and firm conviction that a mistake has been made.  Streber v. Comm'r, 138 F.3d 216, 219 (5th Cir. 1998).  We review the Tax Court's legal conclusions de novo, applying the same standards as that court.  Estate of Clayton, 976 F.2d at 1490.

## III.  DISCUSSION

## A.  Valuation of the Timber Property

The value of the Johnco stock for estate tax purposes depended principally on the fair market value of the Timber Property at the date of Helen's death.  The concept of fair market value represents the price that a willing buyer would pay a willing seller, if both have reasonable knowledge of the facts and neither is under compulsion.  Estate of Bright v. United States, 658 F.2d 999, 1005 (5th Cir. 1981).  The buyer and seller are hypothetical,

---

[2]    This value reflects a capital gains tax discount of $872,920.

9

not actual persons, and each is a rational economic actor, that is, each seeks to maximize his advantage in the context of the market that exists at the date of valuation. Estate of Newhouse v. Comm'r, 94 T.C. 193, 217 (1990). Valuation is a question of fact that may be reversed only for clear error by this court.

Although the parties stipulated to a fair market value of $6 million for the Timber Property, they disagreed whether in valuing Johnco stock, the Estate was entitled to a discount because of the substantial capital gains that would be recognized as timber is harvested and sold. In Johnco's hands, the Timber Property had appreciated enormously since its original purchase, and its basis for tax purposes was $217,850. Any sale of Johnco stock would transfer the Timber Property with the built-in capital gains liability. The estate's valuation experts opined that the only sound economic strategy for a hypothetical purchaser of Johnco would be to liquidate the Timber Property immediately and pay off the 34% capital gains tax. The Commissioner's expert opined, however, that, in part due to creative alternative tax strategies to offset the built-in tax liability, no discount should be recognized.

The Tax Court found neither side's argument fully persuasive. Contrary to the Commissioner's view, the court concluded that some discount for built-in capital gains should be acknowledged based on its recent decision in Estate of Davis v. Comm'r, 110 T.C. 530 (1998). Estate of Davis held that in

10

determining the fair market value of closely held stock after repeal of the <u>General Utilities</u> doctrine,[3] built-in capital gains discounts are not precluded and are appropriate in some circumstances. <u>Id</u>. at 547. The Tax Court also rejected the Estate's valuation of Johnco stock, which it viewed as having been incorrectly derived from Johnco's income rather than its assets. The Tax Court found that the Johnco stock is properly valued under Revenue Ruling 59-60, 1959-1 C.B. 237, according to the fair market value of its assets. The IRS has typically applied an asset approach when a closely held corporation functions as a holding company, and earnings are relatively low in comparison to the fair market value of the underlying assets. <u>See</u> <u>Estate of Davis</u>, 110 T.C. at 536-37. Finally, the Tax Court rejected the Estate's methodology that contemplated immediate liquidation of the Timber Property rather than, as the government's forestry expert testified, its sound cultivation and continued management.

The court then crafted its own valuation. It accepted the parties' $6 million figure as the net asset value for the Timber Property, while estimating a net present value of the capital gains tax liability that will be incurred as the timber is cut. The court used assumptions furnished by the estate, i.e. a 10% annual growth/harvest rate of the timber; a 4% annual inflation rate in the value of the harvest; a 34% capital gains tax rate; and

---

[3]<u>Gen. Utils. and Operating Co. v. Helvering</u>, 296 U.S. 200, (1935).

11

a 20% discount rate. According to the court's method, it would take nine years to pay off the built-in capital gains liability. Consequently, the present value of the liability, and the reduction of the fair market value, is approximately $870,000. This deduction is less than half that sought by the Estate, which sought full deduction of the built-in $1.9 million capital gain liability if the Timber Property were to be liquidated immediately.

Although the Tax Court was not required to credit the valuation testimony of either party, its calculations must be tied to the record and to sound and consistent economic principle. Unfortunately, the court deviated from several criteria of fair market value analysis and thus clearly erred in assessing Johnco's stock value. First, the court should not have assumed the existence of a strategic buyer of the Timber Property, a buyer that most probably would continue to operate it for timber production. Fair market value analysis depends instead on a hypothetical rather than an actual buyer. See Treas. Reg. § 20.2031-1(b); Estate of Bright, 658 F.2d at 1006; LeFrak v. Comm'r, 66 TCM (CCH) 1297, 1299 (1993). While it may well be true that the Timber Property's best use is for sustainable yield timber production, this does not mean that the first, or economically rational, purchaser of Johnco stock would so operate or lease the property. That purchaser would have to take into account the consequences of the unavoidable, substantial built-in tax liability on the property.

Relatedly, the court's misplaced emphasis on a purchaser

12

engaged in long-run timber production led to its peremptory denial of a full discount for the accrued capital gains liability. The hypothetical willing buyer/willing seller test substitutes evidence of the actual owner's or purchaser's intent with the most economically rational analysis of a sale. See Eisenberg v. Comm'r, 155 F.3d 50 (2nd Cir. 1998) (vacating and remanding Tax Court decision because a tax liability upon liquidation or sale for built-in capital gains was not too speculative, and such potential liability should be taken into account in valuing the stock even though no liquidation or sale of the corporation or its assets was planned at the time of valuation. If the evidence did not support an economic case for the buyer of Johnco's stock to engage in long-term timber production, then the Tax Court's discount of the capital gains liability over nine years of further production was erroneous.

Such was the case here. Recognizing the uncertainties inherent in the acquisition, the Estate's experts arrived at substantial discount rates for any hypothetical investment in the property. The Tax Court recognized that the discount rate represents the rate of return necessary to attract capital based on an asset's overall investment characteristics. Moreover, the court did not quarrel with the finding of a 20% annual discount rate, and it applied that rate to the stream of future capital gain taxes. Nevertheless, the court simultaneously recognized that no more than a 14% gross annual rate of return would be received from the

13

ongoing production of timber.  A reasonable hypothetical investor who required a 20% rate of return on Johnco stock would not accept the Timber Property's modest 14% return.  Instead, the investor would liquidate Johnco quickly and reinvest the proceeds.  "Courts may not permit the positing of transactions which are unlikely and plainly contrary to the economic interest of a hypothetical buyer." Estate of Smith v. Comm'r, 198 F.3d 515, 529 (5th Cir. 1999), citing Eisenberg, 155 F.3d at 57.  The Tax Court's internally inconsistent assumptions, that a hypothetical purchaser of Johnco stock would engage in long-range timber production even though the Timber Property's annual rate of return is substantially lower than the investor's required return,  fatally flawed its decision to discount the future flow of capital gains taxes.

Whether the record supports other estimates of the value of Johnco stock is unclear.  Because the Tax Court clearly erred in its approach to the discount of capital gains taxes on the Timber Property, this issue must be remanded for further consideration.

**B.    The Family Settlement Agreement.**

The Estate argues that the Tax Court clearly erred in disregarding the share value set forth in Andrew and Dinah's Family Settlement Agreement.  It notes that even the Tax Court recognized that the two negotiated at arm's length.  The Estate asserts that Estate of Warren v. Comm'r, 981 F.2d 776 (5th Cir.1993), controls.

"In general, comparable sales constitute the best evidence of market value." United States v. 320.0 Acres of Land,

14

605 F.2d 762, 798 (5th Cir.1979) (holding that courts should liberally admit evidence of comparable sales and allow the fact-finder to evaluate them). The more comparable a sale is in characteristics, proximity, and time, the more probative it is of value. Id. Courts have observed, however, that agreed valuations near in time to a decedent's death are not conclusive. United States v. Simmons, 346 F.2d 213, 216 (5th Cir.1965) (holding that a decedent's tax settlement with the IRS did not establish the value of his estate's claim against the IRS as a matter of law); First Nat'l Bank of Kenosha v. United States, 763 F.2d 891, 895 (7th Cir.1985) (admitting evidence of an agreement valuing property after the decedent's death, but observing that such evidence was not conclusive).

In United States v. Certain Land in City of Fort Worth, 414 F.2d 1026 (5th Cir. 1969), a jury valued a landowner's condemned property at $82,000. The government appealed, arguing that the jury instructions should have placed greater weight on the fact that the landowner bought the property for $50,000 just thirteen months before the condemnation. Id. at 1027. Rejecting the government's argument, this court noted that land values could fluctuate considerably in thirteen months. It also observed that a prior sale of a property is not entitled as a matter of law to greater weight than sales of comparable property. Id. at 1028 (citing Hickey v. United States, 208 F.2d 269, 273 (3rd Cir.1954)). Thus, finders of fact may in some cases disregard recent sales of

15

even the very property at issue. Under these general principles, the court was not required to credit the values premised in the Family Settlement Agreement.

Further, despite the Estate's contentions, <u>Warren</u> does not control. In <u>Warren</u>, the decedent bequeathed part of her estate to a charity. The charity altered the will distributions through a settlement with the heirs. The IRS and the estate disputed the size of the charitable deduction that the estate could claim. This court concluded that the assets received by the charity under the bona fide settlement qualified for the deduction under the applicable statute. <u>Warren</u>, 981 F.2d at 782-84. <u>Warren</u> concerned the binding status of a settlement of litigation in probate court on the value of a charitable deduction, not, as here, the persuasive effect of an out-of-court settlement on the issue of an asset's value. <u>Warren</u> is not directly relevant to this case.

Here, Andrew and Dinah entered into an agreement valuing Johnco shares more than two years after Helen's death. The Tax Court disregarded the valuation principally because it appeared to derive from the assumption that a buyer would liquidate Johnco's Timber Property quickly. Because we have found the court's outright rejection of the liquidation model to be incorrect, its rejection of the siblings' negotiated value may also be incorrect. As a precaution, this finding is vacated and remanded for further consideration.

16

## C.    The Tanglewood Property.

The Estate argues that the Tax Court clearly erred by refusing to apply a capital gains discount for that property. Contrary to the Tax Court's conclusion, the Estate addressed this issue in the New Rauscher Appraisal, which calculated Johnco's value based on an immediate liquidation of all Johnco assets. The New Rauscher Appraisal includes a capital gains tax discount for the Tanglewood Property. This property should be subject to a capital gains discount because a reasonable buyer of Johnco would consider the company's low basis in the property in determining a purchase price. The Tax Court should apply a discount on remand.

## D.    The Number of Johnco Shares in the Estate.

The Estate asserts that the Tax Court clearly erred in determining the number of shares that the Mr. Jameson's Estate transferred to it. It argues that the Tax Court disregarded explicit language in Mr. Jameson's will directing that an independent appraisal establish the number of shares in the bequest to Andrew. As a result of the appraisal, the Estate owns only 80,485 Johnco shares instead of the 81,641 shares that the Tax Court attributed to it.

An unambiguous will must be construed as it was written. El Paso Nat'l Bank v. Shriners Hosp. for Crippled Children, 615 S.W.2d 184, 185 (Tex. 1981).[4] Neither we nor the Commissioner nor

_____

[4]    Mr. Jameson was a Texas resident, so Texas estate cases apply.

17

the Tax Court may redraft the will or vary provisions to reflect Mr. Jameson's presumed intentions. Shriner's Hosp. for Crippled Children of Tex. v. Stahl, 610 S.W.2d 147, 151 (Tex. 1980). Mr. Jameson's will was unambiguous. It expressly directed that Andrew receive shares in accordance with an independent appraisal. Even if Rauscher based Mr. John's estate's Appraisal on unreliable assumptions, as the IRS asserts, this fact does not alter Mr. Jameson's explicit intent to transfer shares in accordance with the valuation.

Granted, the $86.80 Johnco share value that Helen reported on her husband's estate tax return is inconsistent with Rauscher's $44.65 valuation. This discrepancy might be important if we were valuing Johnco shares at Mr. Jameson's death, but we are not. Our sole inquiry is to determine the number of shares that Mr. Jameson granted to Andrew through his will. Since the IRS does not argue that the Rauscher appraisal was not an "independent appraisal," Mrs. Jameson's estate owns only 80,405 shares of Johnco.

E.   Constitutionality of the Estate Tax.

The Estate raises a challenge to the constitutionality of the federal estate tax. It argues that the tax as applied in this case is an unconstitutional direct tax. The Estate concedes that a tax on property actually transferable to a decedent's heirs is

18

constitutional. It asserts, however, that a tax on the portion of the estate used to pay the estate tax is an unconstitutional tax on a tax, resulting in this case in an effective rate of 92.7% on the property actually received by the heirs. The Estate contends that Congress may assess the tax only on assets that a donee actually receives through the bequest.

The Constitution provides that "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." U.S. Const. Art. I, sec. 9. This provision bars Congress from imposing a "direct" tax without apportioning it to the population. Congress need not, however, apportion "an excise upon . . . the shifting from one to another of any power or privilege incidental to the ownership or enjoyment of property." Fernandez v. Wiener, 326 U.S. 340, 352 (1945)

The Supreme Court has repeatedly rejected attempts to portray the estate tax as an unconstitutional direct tax. Fernandez, 326 U.S. at 352-58 (holding that the tax was not direct even though it encompassed a spouse's joint interest in the decedent's property); Tyler v. United States, 281 U.S. 497, 502-04 (1930) (same); New York Trust Co. v. Eisner, 256 U.S. 345, 348-49 (1921) (holding that the tax was not direct even though the government imposed it on the estate rather than the recipient); Knowlton v. Moore, 178 U.S. 41, 82-83 (1900) (holding that the tax was indirect even though the recipient could not shift the tax to

19

others).  These decisions have instead characterized the estate tax as an indirect excise tax conditioned on the transfer of property at a grantor's death.

Congress has broad authority to impose excise estate taxes:

> [T]he power of Congress to impose death taxes is not limited to the taxation of transfers at death.  It extends to the creation, exercise, acquisition, or relinquishment of any power or legal privilege which is incident to the ownership of property, and when any of these is occasioned by death, it may as readily be the subject of the federal tax as the transfer of the property at death.

Fernandez, 326 U.S. at 352.  This language facially contradicts the Estate's argument, since it authorizes taxes not only on the transfer to the heirs but on the entire property that Helen relinquished at death.

The Supreme Court's estate tax decisions have emphasized that hypertechnical distinctions between direct and indirect taxes cannot overcome the historical treatment of the tax and practical considerations. "In determining [whether a tax is direct], no microscopic examination as to the purely economic or theoretical nature of the tax should be indulged in for the purpose of [characterizing it]. . . . Taxation is eminently practical, [and] a tax should be regarded in its actual, practical results. . . ." Knowlton, 178 U.S. at 83 (quoting Nicol v. Ames, 173 U.S. 509, 515 (1899)).  See also New York Trust Co., 256 U.S. at 349 ("[The petitioner's argument fails] not by an attempt to make some scientific distinction, which would be at least difficult, but on

20

an interpretation of language by its traditional use—on the practical and historical ground that [the estate tax] has always been regarded as the antithesis of a direct tax.")

Whether the explanations provided by the Supreme Court of the estate tax's constitutionality are fully persuasive is beside the point for this lower court. Based on the variety of constitutional challenges to it that have been made and uniformly rejected, we see no basis for invalidating the federal estate tax.

## CONCLUSION

Based on the foregoing discussion, we **VACATE** the judgment of the Tax Court and **REMAND** for further proceedings, consistent with this opinion, that will (1) reconsider the amount of the capital gains discount to the Timber Property; (2) allow a discount for built-in capital gains on the Tanglewood Property; (3) re-evaluate the effect of the Family Settlement Agreement; (4) reconsider the value of the Johnco stock, and (5) attribute 80,485 Johnco shares to the Estate.