EMILIO M. GARZA, Circuit Judge,
dissenting:
This case requires us to determine whether the purported reimbursement payments made by Worldwide Labor Support Services (‘Worldwide”) to its temporary employees for meals, lodging and other incidental expenses constituted wages *721 for which federal employment taxes must be paid. In order to avoid the imposition of employment taxes, Worldwide’s reimbursement plan must qualify as an “accountable plan” pursuant to the requirements of 26 C.F.R. § 1.62-2(d)-(f). As the majority opinion clearly explains, the process of determining whether a plan meets these requirements is complex, involving several distinct inquiries. For purposes of this appeal, however, the critical issue is whether Worldwide’s plan was reasonably calculated not to exceed the amount of expenses or anticipated expenses actually incurred by its employees. The majority opinion concludes that Worldwide has established a genuine issue of material fact as to whether its plan was reasonably calculated to reimburse actual or anticipated expenses. In contrast to the majority opinion, I believe Worldwide has failed to make such a showing because their reimbursement scheme bears no logical relationship to the actual or anticipated expenses of Worldwide’s employees.[1]
Worldwide’s method of calculating reimbursement expenses resulted in differing amounts of compensation to employees who were working on the same site and likely incurring similar expenses. Worldwide’s reimbursement plan for the Caterpillar site initially compensated temporary employees living more than 100 miles from the plant $6.00 per hour worked for meals, lodging and other incidental expenses. In determining the reimbursement amount for each employee, Worldwide included both regular and overtime hours. In addition, an employee who worked at the Caterpillar site for more than one month received a fifty-cent increase in hourly reimbursements. After two months at the site, Worldwide gave its employees an additional fifty-cent increase, raising the hourly reimbursement rate to $7.00. Thus, two employees working at the Caterpillar site could receive substantially different reimbursement amounts depending on the total number of hours each employee worked during the week, as well as the amount of time they had been on the site. As a result, Worldwide reimbursed many employees for amounts greater than their own research indicated was the maximum amount of anticipated expenses each employee would incur. Given this fact, no rational jury could find that Worldwide’s plan was reasonably calculated not to reimburse its employees for amounts in excess of actual or anticipated expenses.
Worldwide has not presented any evidence that these disparities reflected differences in the actual expenses of its employees at the Caterpillar site. Instead, the evidence suggests that employees incurred similar lodging and meal expenses regardless of the number of hours worked. Worldwide’s employees paid for lodging by night, not by hour. Thus, an employee who worked forty hours per week, but stayed in a hotel for six nights, would incur identical costs as an employee who worked sixty hours that week, but stayed in the same hotel for six nights. As such, I do not believe that any rational trier of fact could have found that Worldwide’s plan was reasonably calculated not to exceed the actual expenses of its employees.
Worldwide’s employment records indicate that the actual amounts Worldwide reimbursed frequently exceeded the amount of expenses Worldwide anticipated *722 each employee would incur. Worldwide estimated that its employees would spend a maximum of $58.50 per day or $409.50 per week on meals and lodging. Worldwide’s payment records for the period ending August 6, 1995, reveal that it paid sixty-six workers more than the amount their research suggested was the maximum weekly expenses of their employees. Thus, under Worldwide’s plan, in one pay period, about one-quarter of their workforce was reimbursed for more than what Worldwide anticipated was the maximum amount of weekly expenses. Moreover, several of Worldwide’s employees received reimbursement payments that far exceeded Worldwide’s maximum estimates of $409.50 per week. For instance, Quentin Lee received $609.00 in reimbursements during the August 6 pay period and Danny McGhee received $563.50. Again, given this evidence, no reasonable jury could find that Worldwide’s plan was reasonably calculated to compensate its employees for their anticipated expenses.[2]
The majority opinion attempts to counter this evidence by pointing out that an employee working eight hours per day would be reimbursed for an amount within Worldwide’s anticipated expense range, regardless of whether that employee was paid $6.00, $6.50, or $7.00 per hour. Thus, they contend that a rational jury could find that Worldwide’s plan was reasonably calculated to reimburse its employees’ anticipated expenses. The majority opinion is correct that a jury could find that reimbursement payments paid to employees who did not work any overtime hours fell within Worldwide’s anticipated expense range. The problem with the majority’s argument, however, is that many of Worldwide’s employees regularly worked overtime, exceeding the maximum amount of meals and lodging expenses Worldwide anticipated its employees would incur as a result. Because Worldwide’s employees regularly worked overtime hours, the fact that any payments fell within Worldwide’s anticipated expense range was merely coincidental. A rational jury could not ignore these additional overtime reimbursement payments in determining whether Worldwide’s plan was reasonably calculated to reimburse actual or anticipated expenses. Moreover, the rational jury *723 could not ignore the fact that Worldwide regularly reimbursed its employees for more than what its own research indicated was the maximum amount of expenses per week because it included overtime hours in those reimbursement calculations.
The majority opinion finds that, if it were to accept the government’s argument, no hourly per diem reimbursement arrangement could qualify as an accountable plan under the regulations. This result seems unacceptable, since the regulations explicitly authorize such arrangements. The majority opinion, however, misinterprets the government’s position. The government does not argue, as the majority contends, that an hourly per diem reimbursement method must exactly reimburse employees for expenses. Instead, the government merely contends that such an arrangement must be reasonably calculated to reimburse employees only for actual or anticipated expenses. In other words, the plan need not always reimburse employees for the expenses they actually incurred, but it must be structured in such a way so that there is some probability that it will do so.
In certain contexts, an hourly per diem plan such as Worldwide’s could be reasonably calculated to reimburse only actual or anticipated expenses. For instance, the I.R.S.’s revenue procedures cite the example of a pilot or flight attendant who is traveling away from home. See Rev. Proc. 94-77 § 3.03(1). In that context, it is reasonable to conclude that the more hours a flight attendant or pilot works, the longer they will be away from home, and the more reimbursable expenses they will incur for lodging and meals. Thus, there is a logical relationship between the number of hours worked by a pilot or flight attendant and the amount of expenses incurred.[3]
In contrast, Worldwide has not established any relationship between the hours worked by its employees and the expenses they incurred. As the majority opinion concedes, Worldwide’s plan resulted in employees who were away from home for the same amount of time receiving different per diem payments. Because Worldwide’s employees were away from home for the same period of time, regardless of whether they worked eight, ten, or twelve hours a day, they incurred roughly the same amount of reimbursable expenses. Nevertheless, they received different reimbursement amounts. Thus, Worldwide’s plan, unlike the hourly per diem payments to pilots or flight attendants, was not reasonably calculated to reimburse Worldwide’s employees for the expenses they incurred.
The preceding point is critical because the majority opinion relies heavily on the Eleventh Circuit’s decision in Trucks, Inc. v. United States, 234 F.3d 1340 (11th Cir.2000), to support its decision. In Trucks, the plan at issue reimbursed truckers for their expenses on a per diem rate based on the “load revenue” the drivers earned. The load revenue was calculated primarily *724 by the number of miles driven, but also took additional factors such as weather, unloading and reloading time, and road conditions into account. Id. at 1341. Thus, load revenue roughly approximated the amount of time a truck driver would be driving. The greater the load revenue earned by a truck driver, the more time he would be away from home and the more expenses for meals and lodging he would incur. Given this fact, the court concluded that Trucks had provided sufficient evidence that its plan was reasonably calculated not to exceed the anticipated expenses of its employees to preclude summary judgment.
Worldwide’s reimbursement scheme, however, is distinct from the one the court dealt with in Trucks because Worldwide’s employees’ expenses did not increase with each additional hour worked. Rather, I find the Ninth Circuit’s decision in Shotgun Delivery, Inc. v. United States, 269 F.3d 969 (9th Cir.2001), persuasive in this instance. Shotgun involved a messenger company whose drivers used their own vehicles to make pick-ups and deliveries. Shotgun’s reimbursement scheme paid its drivers a forty percent commission on each delivery in two checks. The first check compensated the drivers for the number of hours they worked. The amount paid for hourly wages then was deducted from the forty percent commission and the remainder was included in a second check which purported to cover mileage expenses. As a result of this plan, the lesser number of hours each employee worked to make his or her deliveries resulted in a greater amount of tax-free compensation. The court concluded that Shotgun’s plan did not qualify as an “accountable plan” because the “key determinant driving the [reimbursement] allocations [was] hours worked, a factor that [bore] little, if any, correlation with mileage expenses.” Id. at 973. The court went on to state that “Shotgun drivers doing identical routes with identical delivery charges could receive additional compensation distributions that differed according to driving time.” Id.
Similar to Shotgun’s plan, Worldwide’s method of reimbursing employees bears little, if any, correlation to the actual expenses its employees incurred.[4] Moreover, underlying the Shotgun decision was evidence that Shotgun was attempting to encourage certain types of employee behavior at the expense of the government. In essence, a Shotgun employee who made faster deliveries, thereby working fewer hours, would receive a greater portion of his or her check tax free. Here, Worldwide’s workers have a similar incentive to work more overtime hours so as to receive larger, tax-free reimbursements. Because these amounts often exceed their anticipated daily expenses, Worldwide’s employees essentially receive a tax-free bonus if they work overtime. Thus, Worldwide’s particular reimbursement method, like the one in Shotgun, encourages its employees to engage in conduct beneficial to the company.
Given the evidence presented, no rational jury could find that Worldwide’s plan was reasonably calculated to reimburse *725 ment its employees for their actual or anticipated expenses. Thus, I believe the district court correctly found that Worldwide’s reimbursement plan did not qualify as “accountable plan” under the regulations. For the foregoing reasons, I would AFFIRM the judgment of the district court.

. It is important to note that even though this case comes to us on summary judgment and therefore the record must be viewed in the light most favorable to the non-movant, Worldwide, as a taxpayer, still bears the burden of proof as to whether the government's tax assessment was erroneous, as well as the amount of the- refund due from the government. Brown v. United States, 890 F.2d 1329, 1334 (5th Cir.1989).

. Worldwide relies heavily on the fact that only seven percent of its reimbursement payments exceeded the federal per diem rate of $66. As the majority opinion concedes, however, Worldwide's reliance on the federal rate is not availing because its own research indicated that the anticipated expenses of its employees would be below the federal rate for the locality. Revenue Procedure 94-77, which defines a "per diem allowance” provides:
The term "per diem allowance” means a payment under a reimbursement or other expense allowance arrangement that meets the requirements specified in § 1.62-2(c)(1) and that is
(1)paid with respect to ordinary and necessary business expenses incurred, or which the payor reasonably anticipates will be incurred, by an employee for lodging, meal, and/or incidental expenses for travel away from home in connection with the performance of services as an employee of the employer,
(2) reasonably calculated not to exceed the amount of the expenses or the anticipated expenses, and
(3) paid at the applicable Federal per diem rate, a flat rate or stated schedule, or in accordance with any other Service-specified rate or schedule.
Rev. Proc. 94-77 § 3.01. Under this regulation, the reimbursement payment must be reasonably calculated not to exceed actual or anticipated expenses and must be paid at the federal per diem rate or at a flat rate or stated schedule. Thus, even if Worldwide reimbursed its employees at the applicable federal rate, because its research indicated that its employee’s actual and anticipated expenses were significantly lower, its payments would not be reasonably calculated to reimburse the amount of its employees’ expenses or anticipated expenses under the regulations.

. The majority opinion attempts to undermine this reasoning by pointing out that "[a] flight attendant who works eight hours a day pays the same price for a hotel room as a flight attendant who works for ten hours.” Thus, the flight attendants’ hourly per diem arrangement will "not perfectly correspond” to the employees’ expenses. The majority opinion appears to overlook that the regulations do not require a perfect correlation. They require only that an employer’s reimbursement system be reasonably calculated not to exceed an employee’s expenses. In the majority opinion's hypothetical, the two flight attendants might incur the same expenses for lodging, but would not necessarily incur the same charges for meals. As a result, it might make sense to reimburse them differently. There is certainly a reasonable relationship between the flight attendants’ hours and reimbursable expenses.

. The majority opinion asserts that Shotgun is distinguishable from this case because Worldwide's arrangement "did not admit of such a wide variance as Shotgun's system plainly condoned.” Yet, Worldwide's employment records establish that some employees received more than double the amount of reimbursement payments of other similarly situated employees. Moreover, Worldwide paid several employees in excess of one hundred dollars per week over the sum they calculated to be the maximum amount of weekly expenses. Given these facts, it seems difficult to believe that Worldwide's plan did not condone as wide of a variance in reimbursement payments as the one at issue in Shotgun.